778 N.W.2d 465 (2010)
279 Neb. 468
HEARST-ARGYLE PROPERTIES, INC., et al., appellants,
v.
ENTREX COMMUNICATION SERVICES, INC., et al., appellees.
Hearst-Argyle Properties, Inc., and The Hearst Corporation, appellants,
v.
Entrex Communication Services, Inc., et al., appellees.
Nos. S-09-048, S-09-104.
Supreme Court of Nebraska.
February 19, 2010.
*467 J. Joseph McQuillan, of Walentine, O'Toole, McQuillan & Gordon, Omaha, and Jeffrey R. Learned, of Denenberg Tuffley, P.L.L.C., for appellants.
William R. Johnson and Craig F. Martin, of Lamson, Dugan & Murray, L.L.P., Omaha, for appellee Entrex Communication Services, Inc.
Thomas A. Grennan and Francie C. Riedmann, of Gross & Welch, P.C., L.L.O., Omaha, for appellee Communication Structures & Services, Inc.
Dean Suing, of Katskee, Henatch & Suing, Omaha, for appellee Dudutis Erection & Maintenance, Inc.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.
The issues presented in this appeal arise out of a construction contract requiring that the property owner maintain insurance "without optional deductibles" and providing that if the insurance had deductibles, the property owner would "pay costs not covered because of such deductibles." We must determine whether those provisions insulate the construction contractor from liability and whether public policy permits them to be enforced if the contractor was grossly negligent. We find that the provisions at issue protect the contractor, and we affirm the district court's ruling to that effect.

BACKGROUND
This case began with the July 2003 collapse of a television antenna tower in Omaha, Nebraska. The defendants in this case, Entrex Communication Services, Inc.; Communication Structures & Services, Inc.; and Dudutis Erection & Maintenance, Inc. (collectively the defendants), had either contracted or subcontracted to remove the analog antenna on the tower and replace it with a digital antenna. The owners of the tower, Hearst-Argyle Properties, Inc., and The Hearst Corporation (collectively Hearst), allege that the defendants' negligence caused the tower to collapse, causing over $6 million in damages to Hearst's property.
Hearst and its insurers sued the defendants on that basis. Although their claims were initially filed together, Hearst's claims were eventually separated, under a different trial docket number, from the insurers' claims. The district court granted the defendants' motion for summary judgment against the insurers, concluding that a waiver of subrogation clause in the contract between Hearst and the defendants barred recovery for insured damages. On appeal, we affirmed that conclusion.[1]
Hearst continued to press its claim for $250,000 in alleged damages that had not been covered by insurance, because of its insurance policy deductible. The defendants moved for summary judgment, arguing that subparagraphs 11.4.1 and 11.4.1.3 of the parties' contract barred recovery for the deductible amount. Subparagraph 11.4.1 required Hearst to
purchase and maintain ... property insurance written on a builder's risk "all-risk" *468 or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract modifications and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles.

(Emphasis supplied.) And subparagraph 11.4.1.3 added, "If the property insurance requires deductibles, [Hearst] shall pay costs not covered because of such deductibles."
The district court agreed with the defendants' argument that the contract did not permit Hearst to recover its deductible and granted the defendants' motion for summary judgment.

ASSIGNMENTS OF ERROR
Hearst assigns that the district court erred in concluding that (1) subparagraphs 11.4.1 and 11.4.1.3 bar Hearst's claims for its deductible and (2) Hearst's gross negligence claims are barred by subparagraph 11.4.1.3.

STANDARD OF REVIEW
A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law.[2] The meaning of a contract is also a question of law, as is the determination of whether a contract violates public policy.[3] An appellate court resolves questions of law independently of the determination reached by the court below.[4]

ANALYSIS

APPELLATE JURISDICTION
We first note a jurisdictional issue presented by a clerical error on Hearst's notice of appeal. As noted above, Hearst's claims and the claims of its insurers were separated in the trial court into two separate trial docket numbers. The district court entered summary judgment against Hearst on December 12, 2008. But Hearst's first notice of appeal in this case, filed January 9, 2009, was mistakenly filed under the docket number for the insurers' claims, not Hearst's. And by the time Hearst recognized its error and filed an amended notice of appeal, on January 26, more than 30 days had elapsed from the district court's final judgment.[5] The question, then, is whether either notice was sufficient to perfect Hearst's appeal.
We conclude that the untimely January 26, 2009, notice of appeal was not effective to confer appellate jurisdiction. The January 26 notice of appeal was not filed within 30 days after the entry of the judgment from which Hearst sought to appeal.[6] But Hearst's January 9, 2009, notice of appeal was filed within 30 days of the judgment, albeit under the wrong trial docket number. Section 25-1912 does not expressly require a notice of appeal to display a trial court docket number, or be filed in a particular trial court docket; instead, it requires only a "notice of intention" to prosecute an appeal from a judgment, decree, or final order of the district court. And other courts have found, under comparable circumstances, that a notice of appeal filed *469 under the wrong docket number is not fatal to appellate jurisdiction.[7]
Hearst's defective January 9, 2009, notice of appeal effectively served as a "notice of intention" to prosecute an appeal within the meaning of § 25-1912(1). It displayed the wrong trial docket number, but correctly and specifically identified the parties and the December 12, 2008, order being appealed from. The defendants do not argue that they were confused or misled by the notice of appeal; in fact, the record affirmatively demonstrates that they were not. And Hearst has presented this court with a consolidated record that contains the December 12 order and the evidence upon which the district court's order was based.[8] Under these circumstances, we conclude that § 25-1912(1) was substantially complied with and that we have jurisdiction to consider Hearst's appeal.
We are left with two appellate docket numbers. But a docket number is not synonymous with an appeal. Docket numbers are a function of this court's internal administration, and regard-less of how they have been enumerated, it is clear that there is only one appeal here: Hearst's appeal from the December 12, 2008, summary judgment order. Because it will simplify matters for the trial court if our mandate on appeal corresponds to the trial docket number in which the December 12 order was entered, we accept Hearst's suggestion that we dismiss case No. S-09-048 as moot, and we enter our judgment in this appeal in case No. S-09-104.

INSURANCE PROVISIONS OF CONTRACT
As noted above, subparagraph 11.4.1 of the parties' contract required Hearst to purchase and maintain builder's "all-risk" insurance "without optional deductibles." Subparagraph 11.4.1.2 required Hearst to notify Entrex Communication Services (hereinafter Entrex) if it did not intend to purchase the required insurance "with all of the coverages in the amount described above," permitting Entrex to obtain such insurance and charge the cost to Hearst. But instead, Hearst obtained insurance with a $250,000 deductible. And subparagraph 11.4.1.3 provides that if Hearst obtained property insurance with deductibles, Hearst "shall pay costs not covered because of such deductibles."
Nonetheless, Hearst argues that the contract does not preclude it from seeking indemnification for the deductible from the defendants. Hearst first points to subparagraph 11.4.7 of the contract, the "Waivers of Subrogation" provision, under which Hearst and Entrex "waive all rights against ... each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other ... for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Paragraph 11.4." (Emphasis supplied.) Hearst argues that because subparagraph 11.4.7 operates only as a waiver of liability "to the extent covered by property insurance," the recovery of any amount not covered by insurancei.e., the deductibleis not waived by this provision. With that much, we agree. Subparagraph 11.4.7 does not preclude Hearst from recovering the deductible amount.
But subparagraph 11.4.1.3 does require Hearst to pay the costs not covered *470 because of the deductible. Hearst argues that it is simply required to pay the costs not covered by the deductible, but that it can still seek indemnification for those costs. Hearst's construction of subparagraph 11.4.1.3, however, makes little sense when read in the context of the entire contract. A contract must receive a reasonable construction, and a court must construe it as a whole and, if possible, give effect to every part of the contract.[9] And a contract is viewed as a whole in order to construe it.[10] Whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses.[11]
Here, subparagraph 11.4.1 required Hearst to obtain property insurance without optional deductibles. Subparagraph 11.4.1.2 required Hearst to notify Entrex in writing if Hearst did not purchase insurance meeting that requirement, and provided that if Hearst chose not to do so, it would bear any resulting costs if Entrex was damaged. The only construction of subparagraph 11.4.1.3 consistent with the preceding provisions is that if Hearst neither obtained the required no-deductible insurance nor informed Entrex of that fact, Hearst would bear any resulting costs. To conclude otherwise would leave Entrex with no way to enforce its rights under paragraph 11.4.
Hearst also argues, briefly, that it was required only to obtain insurance without "optional deductibles" and that there is no proof in this case that the deductible was "optional." But subparagraph 11.4.1.3 more plainly states that "[i]f the property insurance requires deductibles, [Hearst] shall pay costs not covered because of such deductibles." We reject Hearst's argument that the deductible in this case does not fall within the scope of subparagraph 11.4.1.3.
We conclude that the district court correctly read the parties' contract to require Hearst to bear the risk associated with its insurance deductible. We find no merit to Hearst's first assignment of error.

LIABILITY FOR GROSS NEGLIGENCE
Hearst argues that if subparagraph 11.4.1.3 operates to protect the defendants from liability for the deductible amount, it is against public policy and void to the extent that it operates to shield the defendants from liability for gross negligence.[12] Resolving Hearst's argument requires a close examination of two particular decisions of this court: New Light Co. v. Wells Fargo Alarm Servs.[13] and Lexington Ins. Co. v. Entrex Comm. Servs.[14]
In New Light Co., the plaintiff contracted with the defendant for the defendant to install and maintain a fire alarm system. The operative contract contained an exculpatory clause stating that the defendant would not be liable for any loss or damage, irrespective of origin, to persons or property whether directly or indirectly caused by performance or nonperformance of any obligation imposed by the agreement or "`by negligent acts or omissions of [the defendant], its agents or employees.'"[15] *471 The issue before this court was whether the exculpatory clause released the defendant from liability for gross negligence or willful and wanton misconduct.
We held that public policy prohibited such an exclusion. We explained that whether a particular exculpatory clause in a contractual agreement violates public policy depends upon the facts and circumstances of the agreement and the parties involved and that "[t]he greater the threat to the general safety of the community, the greater the restriction on the party's freedom to contractually limit the party's liability."[16] "Common sense tells us that the greater the risk to human life and property, the stronger the argument in favor of voiding attempts by a party to insulate itself from damages caused by that party's gross negligence or willful and wanton misconduct."[17]
Under the circumstances of that case, we reasoned that
when we balance the parties' right to contract against the protection of the public, we find a sufficiently compelling reason to prevent [the defendant] from insulating itself by contractual agreement from damages caused by its own gross negligence or willful and wanton misconduct. Such an agreement would have a tendency to be injurious to the public. This limitation on the freedom to contract is imposed by law because of the potential risks to human life and property and is, therefore, independent of the agreement of the parties.[18]
But in Lexington Ins. Co., the predecessor to this case, we concluded that New Light Co. did not extend to the waiver of subrogation provision contained in subparagraph 11.4.7 of the contract, even though that provision was effective against claims for gross negligence.[19] We recognized that "[a]dmittedly, language in New Light Co. can be read as suggesting that our policy concern was protecting the public by providing incentive for parties to refrain from grossly negligent conduct."[20] We declined, however, to extend our discussion in New Light Co.
We explained that the danger with exculpatory clauses is that a party injured by another's gross negligence will be unable to recover its losses.[21] But such a danger is not present in cases involving waivers of subrogation, because the waiver applies only to losses covered by insurance, so there is no risk that an injured party will be left uncompensated. And we noted that waivers of subrogation served other important policy interests not met by pure exculpatory clauses, because they encouraged parties to anticipate risks and to procure insurance covering those risks, thereby avoiding future litigation, and facilitating and preserving economic relations and activity.[22]
We also noted that in the particular context of a construction contract, a waiver of subrogation avoids disruption and disputes among the parties to the project, eliminating the need for lawsuits and protecting the contracting parties from loss by bringing all property damage under the all-risk builder's property insurance.[23] We recognized "the important policy goal that waivers of subrogation serve in avoiding *472 disruption of construction projects and reducing litigation among parties to complicated construction contracts" and explained that refusing to enforce waivers of subrogation against gross negligence claims "would undermine this underlying policy by encouraging costly litigation to contest whether a party's conduct was grossly negligent."[24] Therefore, we held that public policy favored enforcement of waivers of subrogation even against gross negligence claims.[25]
The present case falls someplace in the middle. On the one hand, as in New Light Co., permitting the enforcement of subparagraph 11.4.1.3 against a claim of gross negligence leaves Hearst, the injured party, uncompensated for that amount of its damages. On the other hand, subparagraph 11.4.1.3 serves many of the same public policy interests as the waiver of subrogation at issue in Lexington Ins. Co., because it encourages the anticipation of risks and the procurement of insurance, and brings those risks under the all-risk builder's property insurance. The property owner is provided an incentive to abide by the terms of the property insurance provisions.
Furthermore, subparagraph 11.4.1.3 is no more or less exculpatory of a grossly negligent defendant than the waiver of subrogation at issue in Lexington Ins. Co. Both provisions permit a grossly negligent party to shield itself from liability. The contract permitted Entrex to protect itself from risk by requiring the purchase of insurancea decision that, in Lexington Ins. Co., we held was favored by public policy. And even if shielded from liability, a contracting party still has an incentive to avoid both negligence and gross negligence, because performing the contracted-for work negligently could threaten its right to payment under the contract.
The present case is distinguishable from Lexington Ins. Co. only insofar as the damages Hearst sustained were uninsured. But they were uninsured because Hearst did not obtain the nondeductible insurance that the contract expressly contemplated. Refusing to enforce subparagraph 11.4.1.3 would leave Hearst in the peculiar position of benefiting from the degree of the defendants' alleged negligence, because if the defendants' negligence was gross, as opposed to ordinary, Hearst would be able to recover damages that by the terms of the contract should have been covered by Hearst's insurance. And that would encourage precisely the sort of costly litigation, to determine whether a party was grossly negligent, that we sought to discourage in Lexington Ins. Co.
On balance, based on the facts and circumstances of the contract and the parties involved,[26] we conclude that enforcement of subparagraph 11.4.1.3 is not contrary to public policy. The power of courts to invalidate contracts for being in contravention of public policy is a very delicate and undefined power which should be exercised only in cases free from doubt.[27] So, a contractual provision should not be declared void as contrary to public policy unless it is clearly and unmistakably repugnant to the public interest.[28]
*473 In this case, as in Lexington Ins. Co., the terms of the contract served to encourage the anticipation of risks and the procurement of insurance against those risks. The parties were sophisticated business entities capable of appreciating those risks. And had the terms of the contract been followed to the letter, none of the alleged damages would have been uninsured. Given the facts and circumstances of the contract and the parties involved, we find that subparagraph 11.4.1.3 is not void as against public policy, and find no merit to Hearst's final assignment of error.

CONCLUSION
We conclude that we have jurisdiction over this appeal by virtue of Hearst's erroneous but sufficiently effective January 9, 2009, notice of appeal. As a result, we enter judgment in case No. S-09-104 and dismiss case No. S-09-048 as moot. We further conclude that the contract required Hearst to bear the costs of its insurance deductible and that the contract's waiver of liability was not void as against public policy. We affirm the judgment of the district court.
APPEAL IN No. S-09-048 DISMISSED.
JUDGMENT IN NO. S-09-104 AFFIRMED.
STEPHAN, J., not participating.
NOTES
[1] See Lexington Ins. Co. v. Entrex Comm. Servs., 275 Neb. 702, 749 N.W.2d 124 (2008).
[2] Connelly v. City of Omaha, 278 Neb. 311, 769 N.W.2d 394 (2009).
[3] See Lexington Ins. Co., supra note 1.
[4] Tolliver v. Visiting Nurse Assn., 278 Neb. 532, 771 N.W.2d 908 (2009).
[5] See Neb.Rev.Stat. § 25-1912(1) (Reissue 2008).
[6] See id.
[7] See, Scherer v. Kelley, 584 F.2d 170 (7th Cir.1978); Johnson v. Ragsdale, 158 S.W.3d 426 (Tenn.App.2004); Seneca Ins. Co. v. Daniel, 93 Fed.Appx. 872 (6th Cir.2004). See, also, U.S. v. Grant, 256 F.3d 1146 (11th Cir. 2001); Arequipeno v. Hall, No. 9625, 2000 WL 420622 (Mass.App.Div. Apr.12, 2000).
[8] See Holste v. Burlington Northern R.R. Co., 256 Neb. 713, 592 N.W.2d 894 (1999).
[9] Lexington Ins. Co., supra note 1.
[10] Keller v. Bones, 260 Neb. 202, 615 N.W.2d 883 (2000).
[11] Poulton v. State Farm Fire & Cas. Cos., 267 Neb. 569, 675 N.W.2d 665 (2004).
[12] See Bamford v. Bamford, Inc., 279 Neb. 259, 777 N.W.2d 573 (2010).
[13] New Light Co. v. Wells Fargo Alarm Servs., 247 Neb. 57, 525 N.W.2d 25 (1994).
[14] Lexington Ins. Co., supra note 1.
[15] New Light Co., supra note 13, 247 Neb. at 59, 525 N.W.2d at 27.
[16] Id. at 63, 525 N.W.2d at 30.
[17] Id. at 64, 525 N.W.2d at 30.
[18] Id.
[19] See Lexington Ins. Co., supra note 1.
[20] Id. at 710, 749 N.W.2d at 130.
[21] Id.
[22] Lexington Ins. Co., supra note 1.
[23] Id.
[24] Id. at 711, 749 N.W.2d at 131.
[25] Id.
[26] See Ray Tucker & Sons v. GTE Directories Sales Corp., 253 Neb. 458, 571 N.W.2d 64 (1997).
[27] Myers v. Nebraska Invest. Council, 272 Neb. 669, 724 N.W.2d 776 (2006); Jeffrey Lake Dev. v. Central Neb. Pub. Power, 262 Neb. 515, 633 N.W.2d 102 (2001).
[28] Ray Tucker & Sons, supra note 26. See, also, State ex rel. Wagner v. United Nat. Ins. Co., 277 Neb. 308, 761 N.W.2d 916 (2009); Jeffrey Lake Dev., supra note 27.