780 N.W.2d 416 (2010)
279 Neb. 615
DAVENPORT LIMITED PARTNERSHIP, appellee,
v.
75TH & DODGE I, L.P., et al., appellants.
No. S-09-387.
Supreme Court of Nebraska.
March 26, 2010.
*419 Heather Voegele-Andersen and Elisa Davies, of Koley Jessen, P.C., L.L.O., Omaha, for appellants.
Joseph E. Jones and Rebecca A. Zawisky, of Fraser Stryker, P.C., L.L.O., Omaha, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.
GERRARD, J.

NATURE OF CASE
Davenport Limited Partnership (Davenport) filed a declaratory judgment action against 75th & Dodge I, L.P.; 75th & Dodge II, L.P.; and Dodge Mortgage, L.L.C. (collectively the Dodge entities), seeking a declaration that the Dodge entities had no rights in a lease relating to a *420 parcel of land near 75th and Dodge Streets in Omaha, Nebraska. When the suit was filed, Davenport was the landlord of the property under a commercial lease to Dodge I. Dodge I sublet the property to Dodge II. The primary question presented in this case is whether Dodge I properly gave notice to Davenport to renew the lease for an additional 10 years or more.

BACKGROUND
In 1960, Ernst Lied leased a 9-acre tract of land located at 7520 Dodge Street in Omaha to The Brandeis Investment Company. The Brandeis Investment Company then leased its interest in the property to Lenrich Associates through a lease (the Ground Lease) originally executed in March 1966. The next month, Lenrich Associates entered into a lease (the Space Lease) with Diana Stores Corporation. The Ground Lease was originally for a 32-year term, expiring in 1998. It allowed for renewal in a minimum of 10-year increments, not to extend beyond the year 2059. To exercise its option to extend the Ground Lease, the tenant was required to give written notice to the landlord at least 12 months before the end of the term. Article XXXI(a) of the Ground Lease states:
On or before one (1) year . . . prior to the expiration date of any then existing term (including the original term hereof or any extended or renewed term occurring after the termination date of the original term hereof), Tenant shall execute and deliver in writing to Landlord, notice of its desire to so extend or renew, and said notice shall set forth the beginning and ending date of any such extended or renewal term.
Through a variety of assignments and transfers, Davenport and the Dodge entities eventually became parties to two separate leases for the property. Davenport became the landlord of the Ground Lease, with Dodge I as lessee, so Dodge I became landlord of the Space Lease, with Dodge II and Dodge Mortgage as lessees. Dodge II and Dodge Mortgage also became leasehold mortgagees of the Ground Lease.
Henry Singer, the president and sole owner of Dodge I's general partner, testified that in 1995, he had a telephone conversation with Alan Baer, a predecessor in interest to Davenport's rights, about renewing the Ground Lease. According to Singer, Baer asked Singer what he "intended to do about [the] lease." Singer said that he "would be renewing the lease to be coterminus with . . . Dodge II," apparently referring to the Space Lease, which runs at least until 2017. Singer testified that Baer responded, "fine, that's okay." There is no written evidence memorializing that telephone conversation. There is also no evidence that Dodge I ever disclosed to Davenport that such a conversation had occurred, at any time between Baer's death in 2002 and May 31, 2007.
It is unclear from the record whether the Ground Lease was formally renewed at the end of the original lease term in 1998. However, Davenport continued to accept rent from Dodge I after the end of the original lease term.
On April 15, 2003, James Maenner, an employee with a commercial real estate investment company, sent a letter to Robert Murray, Davenport's counsel, regarding the possible purchase of Davenport's leasehold position by Dodge I and Dodge II. A report enclosed with the letter indicated that the Ground Lease had expired on May 31, 1998, and could be renewed in 10-year "increments" not past May 31, 2059. Also included under "Important dates for each leasehold position" was the statement "Notice to renew no later than *421 one (1) year before expiration of a renewal period." Singer also received a copy of the letter and report, and there is no evidence that Dodge I or Singer questioned Maenner's statement regarding the lease expiration at that time.
In October 2007, Dodge I advised Davenport that it had found a potential tenant for the Space Lease and sent a consent agreement to Murray asking that a representative of Davenport sign it. In response, Murray, after consultation with Davenport's chairman, sent an e-mail advising Dodge I that Davenport had not received timely written notice from Dodge I in 2007 of its intent to exercise its right to renew the Ground Lease for another 10 years. The e-mail stated that "it is Davenport's understanding that the possessory interest of [Dodge I] will expire as of May 31, 2008," and that "Davenport does not believe it is either fair or, in this case, in compliance with the documents, for [Dodge I] to fail to give notice of renewal until a new tenant has been found for the property."
Upon receipt of the e-mail, Singer was "shocked and surprised." Singer testified that after receiving the e-mail, he reviewed the lease, noting the written notice requirement for a 10-year term renewal. Singer then sent a letter to Murray explaining that he felt Dodge I had "made our intentions clear as to renewing the lease between Davenport and [Dodge I] on several occasions." Singer concluded his letter by stating, "However, as a matter of precaution, this should serve as our formal notice of renewal for an additional ten (10) year term (i.e., ending in 2018)."
One month later, Davenport filed this declaratory judgment action, seeking a declaration that Dodge I had not properly renewed the lease. After a bench trial, the district court entered judgment for Davenport, finding that the Dodge entities had no continuing rights to the lease property. The district court found that Dodge I failed to give written notice, that Davenport did not waive the written notice requirement, and that the acceptance of rent from Dodge I after 1998 operated as an extension of the lease for the 10-year minimum lease period required by the Ground Lease. The Dodge entities appeal.

ASSIGNMENTS OF ERROR
The Dodge entities assign that the district court erred in
(1) finding a 10-year renewal period in the Ground Lease;
(2) finding that Davenport's acceptance of rent following the original term of the Ground Lease constituted only a 10-year extension of the Ground Lease by operation of law;
(3) applying an improper legal standard in determining whether the written notice requirement of the Ground Lease had been waived;
(4) finding that the written notice requirement of the Ground Lease had not been waived;
(5) finding that the telephone conversation between Singer and Baer did not constitute a waiver of the written notice requirement of the Ground Lease;
(6) finding that Dodge I did not properly provide notice of its intent to renew the Ground Lease beyond May 31, 2008; and
(7) finding that Dodge II and Dodge Mortgage's leasehold mortgagee interests end upon termination of the Ground Lease.

STANDARD OF REVIEW
Whether a declaratory judgment action is treated as an action at law or one in equity is to be determined by the nature *422 of the dispute.[1] The determination of rights under a contract is a law action.[2] In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong.[3] The appellate court does not reweigh the evidence but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.[4]
When a declaratory judgment action presents a question of law, an appellate court has an obligation to reach its conclusion independently of the conclusion reached by the trial court with regard to that question.[5] The meaning of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.[6] And whether a contract is ambiguous is a question of law.[7] The meaning of an ambiguous contract, however, is generally a question of fact.[8]

ANALYSIS

GROUND LEASE WAS EXTENDED IN 1998 FOR 10 YEARS
Dodge I's first two assignments of error deal with the duration of the Ground Lease renewal. The district court found that the parties agreed to a 10-year renewal period and that therefore, the Ground Lease extended until May 31, 2008. For reasons that will be explained below, we agree with the district court's conclusion that Singer's 1995 telephone conversation with Baer was not an effective extension of the Ground Lease. But the parties agree that the continued payment and acceptance of rent after 1998 effected an extension of the Ground Lease. The question, under those circumstances, is what term is implied by such an extension. Dodge I argues that the district court erred in finding a 10-year renewal period in the Ground Lease, and specifically contends that it was error to find Davenport's acceptance of rent after expiration of the original term of the Ground Lease constituted only a 10-year extension.
A court interpreting a contract must first determine as a matter of law whether the contract is ambiguous.[9] A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.[10] However, a contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.[11]
*423 In the instant case, the district court effectively concluded that the Ground Lease was ambiguous and determined that the duration of the Ground Lease renewal period was 10 years. The Ground Lease provides, in pertinent part:
Tenant shall have the right and option. . . to renew the term of this lease for additional periods of time, each of which shall not be less than ten (10) years in duration, upon the same terms and conditions as in this lease contained . . . save and except that in no event shall the date of termination of any such extension or renewal period extend beyond May 31, 2059, such option in each such instances to be exercised in the following manner[.]
This provision is susceptible to different interpretations. By the terms of the Ground Lease, a tenant would be able to renew the term of the lease for an additional period of time ranging from 10 to 60 years. Thus, when the parties agree to renew the Ground Lease, it is not at all clear for what duration, except that the "additional periods of time" will not be less than 10 years or extend beyond 2059. In other words, the Ground Lease is ambiguous regarding the effect of an unspecified "holdover" extension of the lease.
Having concluded that the Ground Lease is ambiguous, we turn next to its meaning. A court is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include.[12] Rather, when a court has determined that ambiguity exists in a document, an interpretative meaning for the ambiguous word, phrase, or provision in the document is a question of fact for the fact finder.[13] In this regard, therefore, if a contract is ambiguous, the meaning of the contract is a question of fact, and a court may consider extrinsic evidence to determine the meaning of the contract.[14] A written instrument is open to explanation by parol evidence when its terms are susceptible to two constructions or where the language employed is vague or ambiguous.[15]
The district court's finding that the parties agreed to a 10-year renewal period, and that the Ground Lease was extended only until May 31, 2008, is not clearly erroneous; it is fully supported by the record. To begin with, Maenner's report, which was provided to all the parties and with which none of them disagreed, indicates that the parties understood the Ground Lease to renew in 10-year increments. In particular, the term "increments," and reference to ongoing terms of renewal, suggests the parties foresaw multiple renewal periods and, therefore, did not consider the first renewal, in 1998, to extend the lease until 2059.
Consistent with Maenner's report, Davenport's e-mail to Dodge I in November 2007, regarding Dodge I's failure to renew the Ground Lease for an additional 10 years, is consistent only with an understanding of a 10-year renewal term. Dodge I's response, stating that Dodge I thought its intent to renew was clear, but also serving "formal notice of renewal for an additional ten (10) year term (i.e., ending in 2018)," is also consistent only with such an understanding of the Ground Lease. Singer's response was not that the *424 Ground Lease did not require renewal after 10 yearsit was that Singer thought the Ground Lease already had been renewed for another 10 years. But the 10-year renewal period was assumed. Singer was, in effect, confirming the parties' understanding that the original renewal was for 10 years.
When we consider the judgment in a light most favorable to Davenport, as we must, we conclude that the district court's factual finding that the renewal term was 10 years was not clearly erroneous. Although the parties could have extended the Ground Lease for a period longer than 10 years, so long as it did not extend beyond 2059, the language of the Ground Lease, illuminated by the dealings of the parties, suggests that a holdover extension of the lease would be for a 10-year period. The Dodge entities' first assignment of error is without merit.

PAYMENT AND ACCEPTANCE OF RENT DID NOT EXTEND GROUND LEASE TO 2059
In a related assignment of error, Dodge argues that the district court erred in finding Davenport's acceptance of rent after expiration of the original term of the Ground Lease constituted only a 10-year extension. Dodge I asserts that the payment and acceptance of rent from June 1998 through October 2007 extended the Ground Lease by operation of law to 2059, the total length of time for the option to renew. In support of its position, Dodge I cites Enterprise Co. v. Americom Corp.[16]
In Enterprise Co., the parties entered into a written lease agreement for commercial office space. The lease term ran for 3 years. The lease provided that the tenant would be entitled to a 3-year extension at a higher rent if the tenant exercised the option in writing no later than 6 months before the end of the original term. The tenant did not provide written notice, but instead held over and paid the higher rent provided for in the option. At the end of the first year, the tenant vacated the premises. The landlord contended that the tenant had exercised the option by holding over and was liable for the 2 remaining years of the extended term. The Nebraska Court of Appeals agreed and held that the tenant exercised the option to renew the lease for the extended 3-year term when it held over and paid the increased rent as provided in the option provision of the written lease, even though it did not provide written notification of its exercise of the option.
Enterprise Co., however, is of limited value here. In Enterprise Co., the tenant's only extension option was for a 3year period at a higher rent. In this case, however, the Ground Lease permitted a tenant to renew potentially six times, as long as the renewal term was at least 10 years and did not last beyond 2059. In fact, Enterprise Co. supports the district court's judgment, because Enterprise Co. makes clear that an extension by defaulta holdoveroccurs pursuant to the extension provision of the lease. As we discussed above, the record makes it clear that the parties to this case renewed the Ground Lease in 1998 for 10 years. The payment of rent was consistent with that understanding.
We cannot agree with Dodge I's contention that Enterprise Co. supports a finding that the Ground Lease was extended until 2059. Neither the language of the contract nor the behavior of the parties was consistent with such an understanding. Therefore, we conclude that Dodge I's second assignment of error is without merit.

*425 DAVENPORT DID NOT WAIVE NOTICE REQUIREMENT
To comply with the contractual language of the Ground Lease, Dodge I was required to provide written notice of its intent to renew the Ground Lease. The district court reasoned that Singer's purported extension of the Ground Lease, in his 1995 telephone conversation with Baer, was ineffective because Baer did not waive the written notice requirement. Dodge I argues that the district court erred and that the Ground Lease was extended in 1995 to last until 2017.
Waiver is a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right.[17] In order to establish a waiver of a legal right, there must be clear, unequivocal, and decisive action of a party showing such purpose, or acts amounting to estoppel on his or her part.[18] A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive.[19]
Our precedent has long adhered to the general rule that acceptance of an option to extend a lease must be strictly construed in accordance with the terms of the option.[20] For example, in Wolf v. Tastee Freez Corp.,[21] we held that a lessee who provided only an 89-day written notice in the face of a provision which required a 90-day written notice had failed to properly exercise the renewal option. We held that a notice of renewal was served too late, but we reversed the trial court's grant of a summary judgment in favor of the lessors, because there was a question of fact as to whether oral notice was timely given. In so ruling, we wrote:
The lessors' agreement to renew is an executory contract, and until the lessee has exercised it in some affirmative way, the lessor cannot be held for the additional term. That the acceptance of an offer must be made within the time specified in the offer is a general rule of law.[22]
Under a provision specifically designating the time within which notice to extend a lease must be given, that time is of the essence, and such provision is to be strictly construed.[23] A lessee has no right to the renewal term unless the option is exercised in a timely manner in strict accordance with the specifications of the lease agreement.[24]
As a preliminary matter, Dodge I argues that the district court erred in applying an "improper legal standard" in determining whether the written notice requirement of the Ground Lease had been waived. If the proper legal standard had been applied, Dodge I argues, the district court would have found a waiver of the written notice requirement. And Dodge I argues that the district court erred in finding that the written *426 notice requirement of the Ground Lease was not waived by the telephone conversation between Singer and Baer. Essentially, Dodge I argues that if Wolf had been applied to the facts here, the district court would have found a waiver of the written notice requirement.
The district court discussed Wolf at length and concluded that it was of limited value in deciding this case. We agree. As explained above, in Wolf, we held that a notice of renewal was served too late, but we reversed the trial court's grant of a summary judgment in favor of the lessors, because there was a question of fact as to whether oral notice was timely given. In Wolf, there were multiple conversations regarding the renewal term, near the time for renewal of the lease, and there was specific reference to the notice requirement. The lessors offered that the lessee could provide notice to the lessors at a later time in the following spring, after the written notice of renewal was required.
The facts here are substantially different. To begin with, the district court questioned whether the alleged conversation between Singer and Baer occurred, noting that Dodge I failed to disclose the purported conversation anytime prior to Singer's deposition. The court also noted that the alleged conversation was not mentioned in Singer's November 2007 letter to Davenport, despite the letter's reference to three other circumstances which Dodge I believed satisfied its intent to renew. In fact, there is no evidence that at any time between 2002, when Baer died, and May 31, 2007, Dodge I ever disclosed to Davenport that such a conversation occurred.
Furthermore, even if the purported conversation took place, there is no evidence that Baer voluntarily and intentionally relinquished a known existing legal right, namely a right to waive notice of renewal. Based on our review of the record, we find no evidence that Baer intentionally relinquished a known right or that either party was considering the notice requirement when the telephone conversation occurred.
Given the lack of evidence surrounding the alleged conversation, we cannot construe the acceptance of rent after the expiration of the original term as supporting a conclusion that the Ground Lease was extended to 2017 with no written notice. And we cannot find that the district court's findings to that effect were clearly wrong. Dodge I can point to only one purported conversation that occurred in 1995 roughly 12 years before expiration of the first 10-year renewal term and 2 years before the original term expiredthat made no reference to the notice requirement. Therefore, we conclude that Dodge I's assignment of error is without merit.

LEASEHOLD MORTGAGEES CANNOT CURE EXPIRATION OF GROUND LEASE
In the final assignment of error, Dodge II and Dodge Mortgage argue that even if the court finds that Dodge I does not have continuing rights under the Ground Lease, they have (or at least could have) continuing legal rights as leasehold mortgagees pursuant to a "Tri-Party Agreement."
The parties to the Tri-Party Agreement, which was entered into shortly after the Ground Lease, were the fee owner of the property (Lied), Davenport's predecessor (The Brandeis Investment Company), and Dodge I's predecessor (Lenrich Associates), and the Tri-Party Agreement is binding upon the successors in interest to its parties. At issue here is exhibit D to the Tri-Party Agreement. The Tri-Party Agreement provided that the parties would execute exhibit D within 10 days of a request made by the sublessee, now Dodge I. Exhibit D provides, in pertinent part:

*427 3. That notwithstanding any provisions in the Lease the Fee Owner [Lied] and Fee Lessee [Davenport] will permit Leasehold Mortgagee [Dodge Mortgage] to cure any default on the part of Sublessee [Dodge I] from time to time in accordance with the provisions contained in [the Ground Lease] . . . and that further they will permit any Leasehold Mortgagee, its successors and assigns, to obtain a new sublease under the terms and provisions as set forth in the [Ground Lease] and as referred to in paragraph 1 above, notwithstanding any forfeiture, termination or other cancellation or surrender of said [Ground Lease].
Dodge II and Dodge Mortgage argue that exhibit D provides them a right to cure in the event the Ground Lease expires. Specifically, they argue that the term "termination" includes expiration of the lease. Davenport contends, on the other hand, that the terms "forfeiture," "termination," "cancellation," and "surrender" do not include expiration. And because the Ground Lease expired, Davenport argues, Dodge II and Dodge Mortgage are not permitted to cure any default by Dodge I.
A court is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include.[25] And a contract is viewed as a whole in order to construe it.[26] Whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses,[27] and all writings forming part of the same transaction are interpreted together.[28]
Here, the term "expiration" was not included in paragraph 3 of exhibit D, but "expiration" was included in other sections of the Tri-Party Agreement. For example, paragraph C of the Tri-Party Agreement states that the fee owner agrees to the Ground Lease and would be bound by the Ground Lease "in the event of the cancellation, termination, expiration or surrender of the Lease [to Davenport] for any reason." (Emphasis supplied.) And the term "expiration" is used in relation to a lease or sublease several other times in the Tri-Party Agreement and its exhibits.
Most pertinently, exhibit C to the Tri-Party Agreement was drafted to secure the interests of lessees under the Space Lease, much in the same way that exhibit D was drafted to secure the interests of leasehold mortgagees. But unlike exhibit D, exhibit C expressly provided that the Space Lease would remain in effect "[i]n the event of the termination of the [Ground Lease] or in the event said [Ground Lease] shall terminate or expire for any reason whatsoever before any of the dates provided for in said Space Lease. . . ." (Emphasis supplied.) And, in fact, the record establishes that Dodge II has availed itself of exhibit C to extend its tenancy through the end of the Space Lease, despite the expiration of the Ground Lease.
The Tri-Party Agreement and exhibits, when read together, support the district court's conclusion that the natural expiration of the Ground Lease is not a "termination" of the Ground Lease within the meaning of exhibit D. Exhibit D permits *428 a leasehold mortgagee to cure a "default" by Dodge I on the Ground Lease and obtain a new lease under the terms of the Ground Lease notwithstanding "termination." But a "default," in this context, is the omission or failure to perform a legal or contractual duty.[29] Because Dodge I was not required to extend the Ground Lease, no "default" occurred here. And contrary to the Dodge entities' argument, a "termination" can refer not only to an ending or conclusion, but to "[t]he act of ending something."[30] It is apparent that when used in the Tri-Party Agreement, the word "termination" refers not to a natural expiration brought about by the passage of time, but to a premature termination effected by some other cause.[31]
In other words, exhibit D would have been available to a leasehold mortgagee had Dodge I breached the Ground Lease, permitting Davenport to terminate the Ground Lease before it expired. But that is not the case here. The expression of one thing implies the exclusion of another,[32] and in this case, the use of the words "expiration" and "termination" together in several places, but not in exhibit D, provides ample support for the district court's conclusion that the expiration of the Ground Lease was not a "termination" within the meaning of exhibit D.
The mortgagee of the leasehold interest takes his mortgage subject to all of the covenants and conditions of the lease, and the mortgage is only coextensive with the term of the lease.[33] The mortgage interest falls with the termination of the leasehold interest.[34] Because Dodge I did not provide written notice of its intent to renew the Ground Lease for another term by May 31, 2007, the lease expired on May 31, 2008, and Dodge II and Dodge Mortgage cannot rely on exhibit D of the Tri-Party Agreement to revive it.

CONCLUSION
Based on the foregoing reasons, we affirm the judgment of the district court.
AFFIRMED.
MILLER-LERMAN, J., not participating.
NOTES
[1] Boren v. State Farm Mut. Auto. Ins. Co., 225 Neb. 503, 406 N.W.2d 640 (1987).
[2] See Perry v. Esch, 240 Neb. 289, 481 N.W.2d 431 (1992).
[3] Anderson Excavating v. SID No. 177, 265 Neb. 61, 654 N.W.2d 376 (2002).
[4] Pavers, Inc. v. Board of Regents, 276 Neb. 559, 755 N.W.2d 400 (2008).
[5] Mortgage Express v. Tudor Ins. Co., 278 Neb. 449, 771 N.W.2d 137 (2009).
[6] Builders Supply Co. v. Czerwinski, 275 Neb. 622, 748 N.W.2d 645 (2008).
[7] See Gary's Implement v. Bridgeport Tractor Parts, 270 Neb. 286, 702 N.W.2d 355 (2005).
[8] Id.
[9] Kluver v. Deaver, 271 Neb. 595, 714 N.W.2d 1 (2006).
[10] Id.
[11] Id.
[12] Gary's Implement, supra note 7.
[13] Id.
[14] Ruble v. Reich, 259 Neb. 658, 611 N.W.2d 844 (2000).
[15] In re Trust Created by Cease, 267 Neb. 753, 677 N.W.2d 495 (2004).
[16] Enterprise Co. v. Americom Corp., 1 Neb. App. 1125, 510 N.W.2d 537 (1993).
[17] Jelsma v. Scottsdale Ins. Co., 231 Neb. 657, 437 N.W.2d 778 (1989).
[18] Id.
[19] Id.
[20] Guy Dean's Lake Shore Marina v. Ramey, 246 Neb. 258, 518 N.W.2d 129 (1994).
[21] Wolf v. Tastee Freez Corp., 172 Neb. 430, 109 N.W.2d 733 (1961).
[22] Id. at 432, 109 N.W.2d at 735.
[23] Guy Dean's Lake Shore Marina, supra note 20.
[24] Id.
[25] Gary's Implement, supra note 7.
[26] Hearst-Argyle Prop. v. Entrex Comm. Servs., 279 Neb. 468, 778 N.W.2d 465 (2010).
[27] Poulton v. State Farm Fire & Cas. Cos., 267 Neb. 569, 675 N.W.2d 665 (2004).
[28] See, Union Ins. Co. v. Land and Sky, Inc., 247 Neb. 696, 529 N.W.2d 773 (1995); Smith v. United States Fidelity & Guaranty Co., 142 Neb. 321, 6 N.W.2d 81 (1942).
[29] Black's Law Dictionary 480 (9th ed. 2009).
[30] Id. at 1609.
[31] Cf. Reimers-Hild v. State, 274 Neb. 438, 741 N.W.2d 155 (2007).
[32] See, e.g., Hafeman v. Gem Oil Co., 163 Neb. 438, 80 N.W.2d 139 (1956).
[33] Bowen v. Selby, 106 Neb. 166, 183 N.W. 93 (1921).
[34] Id.