## CONCLUSION

I disagree with the majority's application of the "inexplicably intertwined" exception to the two October 2008 incidents which, I believe, fall under § 27-404(2). The court erred in admitting these incidents without a § 27-404(3) hearing. I conclude, however, that the error was harmless and therefore concur in the judgment.

Stephan and Miller-Lerman, JJ., join in this concurrence.

Stephan, J., concurring.

To the extent that both of Smith's statements to Corey in October 2008 can reasonably be understood as constituting threats, as the majority characterizes them, I agree with my concurring colleagues that they were subject to Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2012), but their admission under the "inexplicably intertwined" exception was harmless error.

I write separately only to note my view that the first of the statements, which unlike the second did not involve any display of weapons, was ambiguous and could also be reasonably understood to mean that Smith did not wish to have any involvement with Corey because he was a "snitch." So construed, I would not regard that statement as "[e]vidence of other crimes, wrongs, or acts" within the meaning of § 27-404(2). But its admission at trial would constitute, at worst, harmless error. Therefore, I concur in the judgment.

———————

Gridiron Management Group, LLC, appellant, v.
Travelers Indemnity Company, appellee.
___ N.W.2d ___

Filed November 15, 2013.    No. S-12-1129.

1. **Administrative Law: Judgments: Appeal and Error.** A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act, Neb. Rev. Stat. §§ 84-901 to 84-920 (Reissue 2008, Cum. Supp. 2012 & Supp. 2013), may be reversed, vacated, or modified by an appellate court for errors appearing on the record.

2. ____: ____: ____. When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

3. **Administrative Law: Appeal and Error.** In an appeal under the Administrative Procedure Act, an appellate court will not substitute its factual findings for those of the district court where competent evidence supports the district court's findings.

4. **Administrative Law: Presumptions: Proof.** When challenging the decision of an administrative agency, the presumption under Nebraska law is that the agency's decision was correct, with the burden of proof upon the party challenging the agency's actions.

5. **Contracts.** Where the terms of a contract are clear, they are to be accorded their plain and ordinary meaning.

6. ____. A contract is viewed as a whole in order to construe it.

7. **Administrative Law: Appeal and Error.** Where a correct result is based upon facts that have not been found by an administrative agency, an appellate court may not affirm on different grounds. But an appellate court is without power to affirm on a different ground only when doing so would usurp the administrative agency's role as a finder of fact or as a maker of policy, or would otherwise intrude upon the domain entrusted to the administrative agency.

Appeal from the District Court for Lancaster County: KAREN B. FLOWERS, Judge. Affirmed.

Michael J. Mullen, of Burns Law Firm, for appellant.

Justin High, of Taylor, High & Younes, and CeCelia C. Ibson, of Ibson Law Firm, for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, STEPHAN, McCORMACK, MILLER-LERMAN, and CASSEL, JJ.

HEAVICAN, C.J.

## I. INTRODUCTION

The district court, acting as an intermediate court of appeals under the Administrative Procedure Act, affirmed the decision of the director of the Department of Insurance. At issue on appeal is the appropriate experience modifier (XMod) to be used when calculating the premium owed by Gridiron Management Group, LLC (Gridiron), for its workers' compensation insurance. We affirm the decision of the district court.

## II. BACKGROUND

In 2007, Gridiron purchased the assets of the Omaha Beef indoor football team, owned by Omaha Beef, LLC. The purchase agreement indicated that Gridiron was purchasing

> [t]he property and other rights . . . *including but not
> limited to: all trade names; websites; telephone num-
> bers; football field and related equipment; merchandise;
> football equipment; uniforms and associated peripher-
> als; lease assignment; pre-paid sales revenue for the
> [United Indoor Football] 2008 season; operating sched-
> ules; ticket holder information; advertising informa-
> tion; sponsorship information; profit and loss state-
> ments; office equipment; software; the United Indoor
> Football League franchise rights; furniture; fixtures;
> account receivables; leasehold improvements; records;
> and goodwill . . . .*

Gridiron also agreed to assume a limited number of liabilities
as set forth in an appendix attached to the agreement.

Gridiron is a Nebraska limited liability company formed for
the primary purpose of purchasing and operating the Omaha
Beef indoor football team. Following the purchase, Omaha
Beef, LLC, remained an active corporation according to the
Nebraska Secretary of State's office, but there is no evidence
in the record as to whether Omaha Beef, LLC, continued to
engage in business activity following the sale of the Omaha
Beef football team.

During the first 3 to 4 months of ownership, Gridiron made
several improvements to the operation of the team. First, it
changed the location where practices were held, moving to a
better-lit, safer facility. Unlike Omaha Beef, LLC, Gridiron
required at least one, if not two, trainers to be at each practice.
Gridiron also hired a full-time team chiropractor, mandated
the use of knee braces at practice, and instituted weight train-
ing and nutrition programs for players. Gridiron hired a new
head coach and increased the size of the coaching staff from
two to five. Only a few of the players from the previous years'
roster made the team for the 2008 season. Note that in addi-
tion to operating the Omaha Beef football team, Gridiron was
involved in other business activities, notably the marketing of
boxing matches.

In February 2008, Gridiron applied for workers' compensa-
tion insurance under the Nebraska Workers' Compensation Plan
(NWCP). The NWCP provides a mechanism for purchasing

workers' compensation insurance for employers who cannot obtain such insurance on the open market. The State of Nebraska has contracted with Travelers Indemnity Company (Travelers) to act as carrier for the NWCP, and in such capacity, Travelers is required to provide insurance to every eligible employer who complies with the requirements of the plan and pays the premium. That premium is determined by the National Council on Compensation Insurance, Inc. (NCCI), in accordance with its "Manuals of Rules, Classifications, Rates and Rating Plans." The NCCI uses the "Experience Rating Plan Manual" to assign each applicant with an XMod to be used in calculating the premium. The XMod is based upon an applicant's workers' compensation claims experience—the higher the XMod, the higher the premium. A new business is assigned an XMod of "1.00," and an XMod is recalculated based on an insured's "eligible experience."

Gridiron argued that it was entitled to an XMod of "1.00," because it was a new entity with no claims experience. But the NCCI disagreed and determined that under rule 3-C-1(a), Gridiron was "combinable" with Omaha Beef, LLC, and that thus, the various XMod's assigned to Omaha Beef, LLC, for the relevant time periods must be transferred to Gridiron. An NCCI panel upheld the NCCI's decision, though it instead reasoned that Gridiron was a successor entity to Omaha Beef, LLC, under rule 3-C-1(a)(4).

Gridiron appealed to the Nebraska Department of Insurance. The department affirmed, concluding that (1) Gridiron had the burden of proof; (2) Gridiron was a successor entity to Omaha Beef, LLC; (3) the NCCI panel's decision finding "combinability in accordance with Rule 3-C" was correct; (4) the evidence failed to show that Gridiron and Omaha Beef, LLC, were separate and independent companies; and (5) the NCCI panel's determination of the XMod was correct. The department also found that the issue of unpaid premiums, raised by Travelers for the first time before the department, should be determined in a separate civil action.

Gridiron appealed to the district court, which affirmed. The district court concluded that Gridiron had the burden of proof, but had failed to meet that burden to show that it was not a

successor to Omaha Beef, LLC, under rule 3-C-1(a)(2) and (4). The district court reasoned that Gridiron was a successor to Omaha Beef, LLC, and that change in ownership resulted in the transfer of the workers' compensation rating for Omaha Beef, LLC, to Gridiron. Gridiron appeals.

Note that the district court found error in the department's determination that Gridiron had failed to show it was a separate and independent company from Omaha Beef, LLC, and further found that "this is not about combinability" and that Omaha Beef, LLC, and Gridiron are not combinable entities. Neither of these findings has been appealed.

## III. ASSIGNMENTS OF ERROR

On appeal, Gridiron assigns, restated and renumbered, that the district court erred in finding that (1) Gridiron had the burden of proof to show there was no "'change in ownership'" and (2) a "'change in ownership'" existed such that the XMod of Omaha Beef, LLC, should be transferred to Gridiron.

## IV. STANDARD OF REVIEW

[1-3] A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act, Neb. Rev. Stat. §§ 84-901 to 84-920 (Reissue 2008, Cum. Supp. 2012 & Supp. 2013), may be reversed, vacated, or modified by an appellate court for errors appearing on the record.[1] When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[2] In an appeal under the Administrative Procedure Act, an appellate court will not substitute its factual findings for those of the district court where competent evidence supports the district court's findings.[3]

---

[1] *AT&T Communications v. Nebraska Public Serv. Comm.*, 283 Neb. 204, 811 N.W.2d 666 (2012).

[2] *Id.*

[3] *Id.*

## V. ANALYSIS

### 1. Burden of Proof

Gridiron first assigns that the district court erred in finding that it had the burden of proof to show that the NCCI's XMod determination was incorrect and that there was no "change in ownership" under rule 3-C-1(a).

[4] When challenging the decision of an administrative agency, the presumption under Nebraska law is that the agency's decision was correct, with the burden of proof upon the party challenging the agency's actions.[4] Of course, in this case, the original decision being challenged was that of the NCCI and not the department. But we view this as a distinction without a difference. We conclude that the NCCI's determination, once affirmed by the department, is entitled to a presumption of correctness. And, as noted above, it is the burden of the party challenging that determination—here Gridiron—to show that the decision was in fact incorrect.[5]

Gridiron's first assignment of error is without merit.

### 2. Rule 3-C-1(a)

Gridiron next assigns that the district court erred in affirming the determination below that there was a "change in ownership" under rule 3-C-1(a) supporting the transfer of the XMod for Omaha Beef, LLC, to Gridiron. Gridiron instead contends that it is entitled to an XMod of "1.00," the XMod assigned to new entities without any claims experience. Travelers argues that the decision of NCCI transferring the XMod of Omaha Beef, LLC, to Gridiron was correct because the sale of the Omaha Beef football team from Omaha Beef, LLC, to Gridiron was a change in ownership as contemplated by rule 3-C-1(a).

The insurance policy between Travelers and Gridiron provides that "[a]ll premium[s] for this policy will be determined

---

[4] See, e.g., *In re Application of United Tel. Co.*, 230 Neb. 747, 433 N.W.2d 502 (1988). See, also, *Salem Decorating v. Nat. Coun. on Comp. Ins.*, 116 Or. App. 166, 840 P.2d 739 (1992) (relying on general burden of proof as set forth under evidence code); *Tex. St. Bd. of Dental Exam. v. Sizemore*, 759 S.W.2d 114 (Tex. 1988).

[5] See, e.g., *In re Application of United Tel. Co., supra* note 4.

by our manuals of rules, rates, rating plans and classifications." And the agreement between Travelers and the State of Nebraska provides that the "rating systems and policy forms used by the Contract Carrier shall be those filed by the [NCCI] for use by all member insurers in Nebraska."

Rule 3-C-1(a) of the NCCI's experience rating plan manual states:

> For purposes of this Plan, a change in ownership includes any of the following:
>
> (1) Sale, transfer, or conveyance of all or a portion of an entity's ownership interest
>
> (2) Sale, transfer, or conveyance of an entity's physical assets to another entity that takes over its operations
>
> (3) Merger or consolidation of two or more entities
>
> (4) Formation of a new entity that acts as, or in effect is, a successor to another entity that:
>
> (a) Has dissolved
>
> (b) Is non-operative
>
> (c) May continue to operate in a limited capacity
>
> (5) An irrevocable trust or receiver, established either voluntarily or by court mandate[.]

At issue on appeal are the definitions of change in ownership as set forth in rule 3-C-1(a)(2) and (4).

### (a) Rule 3-C-1(a)(4)

On appeal, Gridiron argues that it is not a successor to Omaha Beef, LLC, under the principles of corporate law and that for this reason, there was no change in ownership under rule 3-C-1(a)(4). For its part, Travelers concedes that Gridiron is not a successor under the principles of corporate law, but suggests that Gridiron is framing the issue incorrectly and that the focus should not be on the corporate entity, but instead should be on "the risk to be insured."[6]

[5,6] Familiar principles guide this court in its interpretation of the language of the manual, namely that where the terms of a contract are clear, they are to be accorded their

---

[6] Brief for appellee at 28.

plain and ordinary meaning.[7] A contract is viewed as a whole in order to construe it.[8]

Under the terms of the NWCP, the contract carrier, Travelers, must utilize the ratings plans of the NCCI. And the policy between Travelers and Gridiron provides that the NCCI manuals will be used by Travelers. This court has held that the NCCI manuals are appropriately incorporated by reference into policies issued under the NWCP.[9]

To properly interpret rule 3-C-1(a), we must consider all of the relevant provisions of the NCCI's rating manual. Rule 3-E-1 provides that the "experience for any entity undergoing a change in ownership will be retained or transferred to the experience ratings of the acquiring, surviving or new entity unless specifically excluded by this Plan." Change in ownership is defined in rule 3-C as reprinted above. Rule 3-F-1 is entitled "Evasion of Experience Rating Modification" and provides:

> Some employers may take actions for the purpose of avoiding an experience rating modification. Other employers may take actions for otherwise legitimate business reasons that nonetheless result in the improper application of an experience rating modification. Regardless of intent, any action that results in the miscalculation or misapplication of an experience rating modification determined in accordance with this Plan is prohibited. These actions include, but are not limited to:
> • Failure to report changes in ownership according to Endorsement WC 00 04 14
> • A change in ownership
> • A change in combinability status
> • Creation of a new entity
> • Transfer of operations from one entity to another entity that is not combinable according to Rule 3-D

[7] *Pavers, Inc. v. Board of Regents*, 276 Neb. 559, 755 N.W.2d 400 (2008).

[8] *Hearst-Argyle Prop. v. Entrex Comm. Servs.*, 279 Neb. 468, 778 N.W.2d 465 (2010).

[9] *Travelers Indemnity Co. v. International Nutrition*, 273 Neb. 943, 734 N.W.2d 719 (2007).

  • Misrepresentation on audits or failure to cooperate with
    an audit[.]
Rule 3-D deals with the combination of entities.

The general rule, then, provides that an experience rating is
retained when an entity undergoes a change in ownership. As
the language of rule 3-E-1 demonstrates, this rule is written
broadly in that the rating transfers to the "acquiring, surviving
or new entity." A change in ownership is also defined broadly
in rule 3-C-1 to encompass five different scenarios as dispar-
ate as a transfer of ownership interest, the purchase of assets,
merger or consolidation, formation of a new entity, or a trust
or receivership. There is nothing in the language of any of
these rules that would suggest the definition of successor under
corporate law principles comes into play here, as is argued by
Gridiron. Rather, the rules suggest that a change in ownership
is intended to be broadly defined to fit with the general rule
that an experience rating will be retained.

And the language of rule 3-C-1(a)(4) itself lends further
support to this conclusion. That rule provides that there is a
"change in ownership" with the "[f]ormation of a new entity
*that acts as, or in effect is*, a successor . . . ." (Emphasis sup-
plied.) Plainly, this language does not limit situations involv-
ing a "change in ownership" to those in which one entity
is actually a successor under corporate law. Instead, it also
includes entities that are "in effect" a successor—clearly a
broader definition.

We conclude that the sale of the Omaha Beef football team
to Gridiron by Omaha Beef, LLC, is a "change in ownership"
under rule 3-C-1(a)(4). Omaha Beef, LLC, was still an active
corporation, but there was no evidence that it was conduct-
ing business—and it certainly was not operating the Omaha
Beef football team. And Gridiron was a new entity that was
"in effect . . . a successor" to Omaha Beef, LLC, because, like
Omaha Beef, LLC, before it, Gridiron's business was operat-
ing the Omaha Beef football team. And because Gridiron was
a successor under rule 3-C-1(a)(4), there was a "change in
ownership" sufficient to permit the transfer of the XMod for
Omaha Beef, LLC, to Gridiron.

### (b) Rule 3-C-1(a)(2)

In addition, we conclude that the district court was correct in finding there was a change in ownership under rule 3-C-1(a)(2). In its appeal of this finding, Gridiron argues that the district court erred in finding a change in ownership under rule 3-C-1(a)(2). Gridiron argues that because the NCCI did not rely on rule 3-C-1(a)(2), the district court erred in doing so. Gridiron further argues that even if the district court properly relied upon rule 3-C-1(a)(2), that definition was not met, because Gridiron did not take on the operations of Omaha Beef, LLC.

We disagree with Gridiron that there was no change in ownership as defined under rule 3-C-1(a)(2). Rather, we find it clear that under rule 3-C-1(a)(2), there was a change in ownership. It is undisputed that Gridiron was formed for the purpose of purchasing and operating the Omaha Beef football team. The purchase agreement clearly states that Gridiron is purchasing the assets of Omaha Beef, LLC, and includes a laundry list of assets, most notably including the United Indoor Football League franchise, the trade name "Omaha Beef," and the goodwill of the Omaha Beef football team. While the purchase agreement does not specifically indicate that Gridiron is purchasing all assets, it also does not exclude any assets from the sale and the parties do not contend that some assets were excluded from the sale. Finally, Gridiron, as a new entity, has taken over the operations of Omaha Beef, LLC: what Omaha Beef, LLC, did—running the Omaha Beef football team—is instead now done by Gridiron. We reject Gridiron's assertions to the contrary.

Nor are we persuaded by Gridiron's assertion that the district court, and now this court, cannot rely on rule 3-C-1(a)(2) to find a change of ownership in this case because the NCCI failed to do so. Gridiron cites no authority to support this contention, and accordingly, we reject it. But even if we construe Gridiron's argument broadly and presume that Gridiron is arguing that this court and the district court can judge the administrative record of the department only on the grounds upon which it was made and not on any other, we still find it to be without merit.

We addressed this issue in *Farmland Foods v. State*.[10] There, the plaintiffs argued that this court could not affirm the decision of the State Tax Commissioner on grounds different than those relied upon by the commissioner in his order. The plaintiffs contended that to do so would be to violate the "'cardinal principle of administrative law,'" as set forth by the U.S. Supreme Court in *Securities Comm'n v. Chenery Corp.*,[11] namely, that the "'grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based and no others.'"[12]

[7] But we explained that the plaintiffs were misconstruing this "'cardinal principle.'"[13] We explained that where the correct result was based upon facts that had not been found by the administrative agency, an appellate court could not affirm on different grounds.[14] But,

> [s]ubsequent decisions from other courts have held that an appellate body is without power to affirm on a different ground only when doing so would usurp the agency's role as a finder of fact or as a maker of policy, or would otherwise intrude upon the domain entrusted to the administrative agency.[15]

In *Farmland Foods*, we ultimately declined to reach the issue of whether we could affirm on grounds different from those cited by an administrative agency. However, we decided the case on similar grounds: "No rule of law precludes this court from affirming an agency decision stating a correct reason and correct facts simply because a portion of those facts was not explicitly connected with the agency's correct reason."[16]

---

[10] *Farmland Foods v. State*, 273 Neb. 262, 729 N.W.2d 73 (2007).

[11] *Securities Comm'n v. Chenery Corp.*, 318 U.S. 80, 63 S. Ct. 454, 87 L. Ed. 626 (1943).

[12] *Farmlands Foods, supra* note 10, 273 Neb. at 268, 729 N.W.2d at 79.

[13] *Id.*

[14] *Farmland Foods, supra* note 10.

[15] *Id.* at 270, 729 N.W.2d at 79.

[16] *Id.* at 270, 729 N.W.2d at 79-80.

We find *Farmland Foods* helpful to our disposition here. The department's order, while somewhat unclear, made the correct findings of fact to support a change in ownership under rule 3-C-1(a)(2), discussed that section, and essentially concluded that it had been met. The order simply failed to note that finding in its conclusions of law section of the order.

We therefore conclude that in addition to the change in ownership under rule 3-C-1(a)(4), there was a change in ownership under rule 3-C-1(a)(2) due to the asset sale and taking over of the business operations of Omaha Beef, LLC, by Gridiron. While this was not a basis for the department's decision, it is supported by the findings made by the department.

Gridiron's second assignment of error is without merit.

## VI. CONCLUSION

The decision of the district court is affirmed.

Affirmed.