IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

BILDERBACK-VESS V. VESS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

BONNIE J. BILDERBACK-VESS, APPELLEE,

V.

MARK A. VESS, APPELLANT.

Filed May 2, 2017.    No. A-16-121.

Appeal from the District Court for Hall County: MARK J. YOUNG, Judge. Affirmed.

Mark Porto, of Shamberg, Wolf, McDermott & Depue, for appellant.

Erin M. Urbom for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

Bonnie J. Bilderback-Vess, now known as Bonnie Bilderback, filed a contempt action against her former husband, Mark A. Vess, due to his failure to file an amended 2013 joint tax return as previously agreed to by the parties and ordered by the district court for Hall County. After an evidentiary hearing, the district court found Mark to be in willful and contumacious contempt of the court's orders; Mark appeals. We affirm.

BACKGROUND

Mark and Bonnie were married in 2001. A few years later, due to Mark's military background in explosive ordnance disposal, they formed a company called Heritage Disposal and Storage L.L.C. (Heritage). By agreement of the parties, the business was structured to obtain tax and contract incentives: Bonnie was majority owner and president of Heritage, and Mark was an employee on an earned salary. Bonnie owned 54.6 percent of the outstanding common stock of Heritage, while other stockholders owned 45.4 percent. Mark and Bonnie separated in 2009; at

- 1 -

that time, both were receiving $18,200 gross per month in compensation. A decree dissolving their marriage was entered on January 14, 2014. While an appeal was pending, Mark filed a complaint on October 14, along with a stipulation signed by the parties dated August 25. An order was entered on December 2 approving that stipulation and ordering it into effect. Pertinent to the present appeal is language contained in the stipulation regarding taxes (Paragraph 3.0):

> 3.0 *Taxes*. In consideration of Mark's obligations as set forth herein, Bonnie agrees to fully participate in filing amended joint tax returns with Mark for the years 2012 and 2013 and execute any and all documents necessary to accomplish the same. Mark shall assume all costs necessary for the preparation of the amended returns and Mark shall be solely responsible for any remaining financial obligations with respect to the 2012 and/or 2013 taxes. Mark shall receive the entirety of any additional refund but Bonnie shall [be] entitled to keep in her sole possession the entirety of any refund previously provided to her by virtue of the 2012 and 2013 tax returns previously filed individually by Bonnie; Any refunds available from refiling of tax returns shall be applied to the back owed child support.

On August 25, 2015, Bonnie filed a "Motion to Show Cause," in which she claimed that pursuant to the December 2, 2014, order, Mark was required to file an amended 2013 joint tax return. Bonnie further claimed that Mark had willfully and contumaciously failed to file said return, and that she was unable to file her 2014 taxes as a result. A hearing took place on December 9, 2015, during which the parties each testified, along with Brad Fegley, a "CPA."

Fegley has been a CPA with the firm McDermott & Miller for 32 years. The firm had been doing tax returns for Mark and Bonnie for several years. Fegley testified that the firm originally filed a 2012 and 2013 individual tax return for Bonnie as head of household. Bonnie's original 2012 return "had net operating losses on it" and "investment interest carryover and contribution carryovers." Those losses and carryovers were in turn carried over to her 2013 and 2014 returns. When Bonnie originally filed her 2012 tax return, she received a federal refund of $31,113 and a state refund of $6,270. Fegley was uncertain as to whether Bonnie received refunds after filing her 2013 tax return. Bonnie testified that she received $11,000 for her 2013 federal refund and $2,000-3,000 for her State refund.

Since Mark was not an owner of Heritage, the only way he could claim any of the operating losses from Heritage would be by filing a joint tax return with Bonnie. Therefore, according to Fegley, when the 2012 return was amended to be a joint return with Mark, "the net operating loss was used up with everything that Mark brought in as far as income, so the net operating loss was used up." Fegley believed the contributions carryover was used up, however the investment interest was not. By revising the 2012 tax return to a joint return, Mark received a federal refund of $39,204 and a state refund of $11,314.

In light of the 2012 amended joint tax return using up all of the company's operating losses, Fegley and Bonnie both testified that Bonnie's 2013 individual tax return would need to be corrected because it reflected losses that could no longer be carried over to 2013. Fegley said that if Bonnie filed an amended individual tax return for 2013, she would owe money back to the

government. He estimated that amount to be about $29,232. Bonnie testified that she could not file her 2014 tax return until the 2013 tax return was corrected.

Mark acknowledged that he did file an amended joint tax return with Bonnie for 2012 so he could access the tax loss carryforwards, but that he was unwilling to take documents to McDermott & Miller to file the 2013 joint tax return because "they inappropriately disclosed information that [Mark] asked them not to." Mark also claimed that the purpose of the stipulation provision related to taxes was to benefit Mark by allowing him access to the business loss carryforward. At the time of the stipulation, Mark did not know if there would be any loss carryforwards remaining for 2013 once they completed the amended 2012 return. It was not until the amended 2012 joint tax return was completed that Mark learned there were no remaining loss carryforwards that would benefit him in 2013. Mark also testified about his concerns in signing a joint return with Bonnie for 2013 based on allegations made against Bonnie claiming she embezzled about $500,000 from Heritage.

The district court entered an order on January 11, 2016, finding Mark to be in contempt of the court's orders. The district court concluded that Paragraph 3.0 of the stipulation was not ambiguous and that the plain reading of that paragraph required Mark to file a 2013 joint return. The court stated:

> If [Mark] had not accepted the need for filing both years, no reason would have been given for him to have included provisions in Paragraph 3 for paying the cost for both year's [sic] tax returns and for dealing with the financial obligations or benefits resulting from both returns in the contract he drafted. The fact that he now receives no advantage from filing a joint 2013 return does not excuse him from fulfilling the agreement he negotiated.

The court further rejected Mark's arguments that filing the tax return with Bonnie might subject Mark to criminal or civil penalties. The court noted that no evidence was presented through the CPA to support Mark's position, and further, the evidence showed no evidence of wrongdoing by Bonnie and nothing in the record indicated that Bonnie improperly took money from the company. Although noting that Bonnie surrendered her stock rather than face potential civil litigation, the court decided the stock transfer was an issue outside the parties' stipulation and was not a defense to Mark's "failure to comply with the terms of the agreement he drafted." After finding Mark in willful, contumacious contempt of the court's orders, the district court allowed Mark to purge himself of the contempt by filing an amended 2013 joint tax return within 90 days. Failure to do so would result in a sentence of 30 days in the Hall County Department of Corrections. Mark timely appealed.

## ASSIGNMENTS OF ERROR

Mark assigns that the district court erred in finding (1) Mark was required to file a joint tax return for the 2013 tax year, and (2) Mark's refusal to file a joint 2013 tax return was willful.

STANDARD OF REVIEW

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed is reviewed for abuse of discretion. *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012).

ANALYSIS

Mark argues that the intent of Paragraph 3.0 "was merely to allow Mark to decrease his tax liability by accessing--to an equal degree as Bonnie--the loss carryforwards that were by all rights a marital asset but could not be accessed by Mark at the time of the initial divorce because of Bonnie's unwillingness to participate in the filing of amended tax returns." Brief for appellant at 17-18. Additionally, Mark claims that at the time of the formation of the stipulation, Bonnie prohibited the accountants from informing Mark "of the details," and "so it was unknown whether this could be accomplished" in one or two years. Brief for appellant at 18. Fegley acknowledged that Bonnie had told the accounting firm not to share "anything to do with her taxes" with Mark, although Fegley was unsure whether they were ever asked how much the net operating losses were. Mark argues that since the amended 2012 joint tax return accomplished the equal division of the business loss carryforwards, there was no need to file a joint return for 2013. Mark suggests that his position is supported by the plain language of the stipulation, and to the extent the language is ambiguous, the facts surrounding the stipulation should be considered.

*Plain Language of Stipulation.*

Mark argues first that the plain language of the parties' stipulation indicates that "the only person obligated to do anything under Paragraph 3.0 was Bonnie and, accordingly, Mark cannot be found in contempt for his decision not to file an amended return for the year 2013." Brief for appellant at 12-13. Mark suggests that since Paragraph 3.0 starts with, "In consideration of Mark's obligations as set forth herein, Bonnie agrees . . .," that "it is apparent that the provision was implemented for the benefit of Mark and Mark alone." Brief for appellant at 12.

We consider Mark's argument with the following legal principles in mind. A contract is viewed as a whole in order to construe it. *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 279 Neb. 615, 780 N.W.2d 416 (2010). Whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses, and all writings forming part of the same transaction are interpreted together. *Id.* Further, a contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms. *In re Estate of Balvin*, 295 Neb. 346, 888 N.W.2d 499 (2016). A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Id.*

The stipulation states that "both Bonnie and Mark now desire to resolve all remaining issues outstanding in relation to the dissolution of marriage proceedings[.]" It contains paragraphs 1.0 through 11.0, which cover a number of topics, including real estate, personal property, taxes,

child support, medical reimbursements, dismissal of appeals, dismissal of contempt proceedings, and attorney fees and costs. Four of the 11 paragraphs begin, "In consideration of Mark's obligations as set forth herein . . .," and three begin, "In consideration of Bonnie's obligations as set forth herein . . . [.]" One paragraph (related to Bonnie's dismissal of her pending appeal to this court) indicates consideration given by both parties. Although there are 11 separate paragraphs, the stipulation is clearly intended to be read as a whole document, noting consideration and obligations for each party arising from the entirety of the agreement. The consideration in each paragraph for "obligations as set forth herein" is not restricted to the obligations and actions set forth only in that paragraph, as some paragraphs do not identify what obligations are specifically associated with that consideration. For example, paragraph 5.0, states that "[i]n consideration of Mark's obligations as set forth herein, Bonnie agrees to immediately execute a receipt for child support for $6,000[.]" No specific obligations from Mark are set forth in that paragraph; therefore, it is clear that each separate provision is taking into consideration the obligations of both parties as set forth throughout the entirety of the stipulation.

We agree with the district court's conclusion that Paragraph 3.0 is not ambiguous and that the plain reading of that paragraph requires Mark to file an amended 2013 joint tax return. Paragraph 3.0 specifically speaks to Bonnie fully participating in filing amended joint tax returns with Mark for "the years 2012 and 2013[,]" and as noted by the district court, also requires Mark to assume all costs necessary for their preparation and makes Mark "solely responsible for any remaining financial obligations with respect to the 2012 and/or 2013 taxes." It gives Mark the benefit of any additional refund and allows Bonnie to keep the "entirety of any refund previously provided to her by virtue of the 2012 and 2013 tax returns previously filed individually by Bonnie[.]" The stipulation makes it clear that Mark was aware Bonnie had already filed individual tax returns for 2012 and 2013, and that she had received refunds in both years. Mark testified he did not know what carryover losses from Heritage were available when he entered into this agreement, and yet he still entered into a stipulation calling for amended joint tax returns for both 2012 and 2013, and which made him "solely responsible" for any remaining financial obligations as to those tax years.

We observe that even at the time of their marriage dissolution trial, Mark was requesting that the court order joint tax returns to be filed for 2012 and 2013. The decree entered January 14, 2014, states, "The parties put forth in their respective positions that [Mark] feels that joint tax returns for 2012 and 2013 should be ordered so that [Mark] may benefit from the continued loss carryover provisions of the tax code." The district court determined it could not compel the parties to file a joint income tax return. Notably, about 7 months later, while an appeal was pending, the parties signed the stipulation agreeing to file amended joint tax returns for 2012 and 2013, even though Bonnie had already filed individual tax returns and received refunds for those years. It would have been apparent to both parties when entering the stipulation that by amending the 2012 tax return, Bonnie's 2013 tax return would also have to be amended one way or another. There is no language in Paragraph 3.0 leaving leeway for Mark to opt out of filing an amended 2013 joint tax return in the event the operating loss carryover was exhausted in the amended 2012 joint tax return.

Mark seeks a reading of the plain language of the stipulation to avoid meeting an obligation he made in August 2014, which in hindsight, ended up being less beneficial than anticipated, at least as to the 2013 tax year. However, as noted by the district court, "The fact that [Mark] now receives no advantage from filing a joint 2013 return does not excuse him from fulfilling the agreement he negotiated." The stipulation is not susceptible of at least two reasonable but conflicting interpretations or meanings, and is therefore not ambiguous. As part of the entirety of the consideration given and obligations made by the parties when entering the stipulation, Mark agreed to file an amended 2013 joint tax return despite not knowing what business carryover losses would be available. There is no error in the district court's legal or factual conclusions as to this issue.

*Mark's Alternative Argument if Stipulation Is Ambiguous.*

Mark also argues that in the event this court concludes Paragraph 3.0 is ambiguous, this court should consider the facts surrounding the stipulation. In particular, Mark suggests the evidence shows that the parties' intention for Paragraph 3.0 was "to allow Mark to access the tax benefit of business losses incurred during the course of the marriage and this was fully accomplished following the submission of the amended joint 2012 return." Brief for appellant at 13. However, since we have already concluded the stipulation was not ambiguous, we need not address this argument. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *Mansuetta v. Mansuetta*, 295 Neb. 667, 890 N.W.2d 485 (2017). We therefore next consider Mark's remaining argument.

*Mark's Failure to File Amended 2013 Joint Tax Return Was Willful.*

Mark argues that in the event this court concludes Mark was required to file an amended 2013 joint tax return, the district court nevertheless erred in concluding Mark's refusal was willful and contumacious in light of Mark's concerns about being exposed to potential criminal liability. Mark claims that filing a 2013 joint tax return with Bonnie would "require[] him to attest to the accuracy of a tax return in which Bonnie's income is clearly clouded with deep suspicion." Brief for appellant at 19. Mark argues that if he is required to file jointly with Bonnie, he would have to "state under penalty of perjury that the income figures reflected in the tax return are accurate notwithstanding direct knowledge by Mark of compelling evidence to the contrary." Brief for appellant at 20. Mark suggests that his refusal to file an amended 2013 joint tax return with Bonnie "was not a willful violation of the December 2, 2014[,] Order but rather a necessity so as to avoid participating in the filing of a fraudulent tax return." Brief for appellant at 21.

It is true that when a party to an action fails to comply with a court order made for the benefit of the opposing party, such an act is ordinarily a civil contempt, which requires "willful" disobedience as an essential element. *Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012). "'Willful' means the violation was committed intentionally, with knowledge that the act violated the court order." *Id.* at 376, 808 N.W.2d at 873. Further, outside of statutory procedures imposing a different standard, it is the complainant's burden to prove civil contempt by clear and convincing evidence. *Id.*

Mark acknowledges his refusal to file the 2013 joint tax return, so his violation was intentional. However, citing to *Locke v. Volkmer*, 8 Neb. App. 797, 601 N.W.2d 807 (1999), *overruled on other grounds, Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 661, 782 N.W.2d 848 (2010), Mark suggests that if it is impossible to comply with the order of the court, the failure to comply is not willful. However, it was not impossible for Mark to comply with the stipulation and order. His excuse for not doing so based upon Bonnie's income being "clouded with deep suspicion" is not persuasive in light of his knowledge (before signing the stipulation) of the accusations brought against Bonnie claiming she diverted company funds for personal use. According to Bonnie, these allegations were instigated by Mark. There is no question Mark had this knowledge prior to entering into the stipulation, yet he had no hesitation about agreeing to file amended joint tax returns for 2012 and 2013 when he apparently believed there would be a financial benefit to him personally. Further, although exhibits 132 and 133 indicate a present investigation related to the time period from January 2013 through March 2014, they also indicate possible additional claims for similar activity in prior years. Mark nevertheless had no qualms about filing an amended 2012 joint tax return which resulted in him receiving slightly over $50,000 in federal and state tax refunds.

Bonnie testified that the stipulation signed on August 25, 2014, took place after receiving the letter dated May 1, 2014 (exhibit 132), which included a copy of a draft complaint (exhibit 133). Bonnie agreed that there were allegations made by Heritage that she had misappropriated funds during 2013 and that she entered into an agreement with Heritage that resolved those allegations. Although Bonnie was shown a document dated July 28, 2014, purporting to be that agreement, Bonnie was not sure of that date. Bonnie testified that she gave her shares back to the company not because of the agreement, but because she did not want the shares with Mark being the manager; she agreed that she was "washing [her] hands of the company." Bonnie further stated that the complaint was never filed against her, nor had any criminal charges been brought against her. Bonnie testified that Mark had knowledge of the allegations brought against her before entering into the stipulation on August 25, 2014, because "Mark Vess is the one that did the allegations." Mark testified that at the time he signed the stipulation, he was "definitely informed that there were allegations made," but that he did not see any legal documentation until preparing for the present matter. Upon questioning from the court, Mark further explained that the only time the owners were addressing concerns for inappropriate access to business funds under Bonnie's control were from January 2013 until Bonnie left in March 2014. However, the documents themselves threaten to investigate additional claims for similar activity in prior years. This was all apparently resolved, however, in July 2014, when Heritage and Bonnie reached an agreement.

The district court rejected Mark's arguments that filing the tax return with Bonnie might subject Mark to criminal or civil penalties. The court noted that no evidence was presented through the CPA to support Mark's position, and further, the evidence showed no evidence of wrongdoing by Bonnie and nothing in the record indicated that Bonnie improperly took money from the company. Although noting that Bonnie surrendered her stock rather than face potential civil litigation, the court decided the stock transfer was an issue outside the parties' stipulation and was not a defense to Mark's "failure to comply with the terms of the agreement he drafted." We find

no error in the determinations made by the district court, which are supported by clear and convincing evidence in the record before us.

After finding Mark in willful, contumacious contempt of the court's orders, the district court allowed Mark to purge himself of the contempt by filing an amended 2013 joint tax return within 90 days; failure to do so would result in a sentence of 30 days in the Hall County Department of Corrections. Mark did not assign error to the sanction imposed, so we need not address that part of the order. As to the court's determination that Mark was in contempt of the December 2, 2014, order by failing to file an amended 2013 joint tax return with Bonnie, we find no abuse of discretion.

## CONCLUSION

Finding no error in the district court's legal or factual findings, nor any abuse of discretion in its determination that Mark was in contempt of the court's orders, the January 11, 2016, order is affirmed.

AFFIRMED.