Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/03/2019 08:06 AM CDT

LAVETA WINSLOW, BY AND THROUGH HER DESIGNATED
AUTHORIZED REPRESENTATIVE THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY - SUPERIOR, APPELLANT, V.
STATE OF NEBRASKA EX REL. DOUGLAS PETERSON,
ATTORNEY GENERAL, AND DEPARTMENT OF
HEALTH AND HUMAN SERVICES, APPELLEES.

___ N.W.2d ___

Filed May 3, 2019.    No. S-18-181.

1. **Administrative Law: Judgments: Appeal and Error.** A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record.

2. ____: ____: ____. When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

3. **Judgments: Appeal and Error.** Whether a decision conforms to law is by definition a question of law, in connection with which an appellate court reaches a conclusion independent of that reached by the lower court.

4. **Medical Assistance: Federal Acts: States.** The Medicaid program provides joint federal and state funding of medical care for individuals whose resources are insufficient to meet the cost of necessary medical care.

5. ____: ____: ____. A state is not obligated to participate in the Medicaid program; however, once a state has voluntarily elected to participate, it must comply with standards and requirements imposed by federal statutes and regulations.

6. **Medical Assistance: Federal Acts: Real Estate.** If a Medicaid applicant is determined to possess real property that is not subject to the home exemption and is considered an available resource, the Nebraska

Department of Health and Human Services is required to make available an "Agreement to Sell Real Estate and Repay Assistance" form to the applicant provided that (1) the applicant has authority to liquidate the property and (2) the applicant would be under the available resource limit if the property is excluded from consideration.

7. **Medical Assistance: Federal Acts: Trusts.** For Medicaid eligibility purposes, available resources can include assets held by trusts if a person establishes that trust with his or her assets and the individual is able to benefit from the corpus of the trust or the income derived therefrom.

8. **Administrative Law: Presumptions: Proof.** When challenging the decision of an administrative agency, the presumption under Nebraska law is that the agency's decision was correct, with the burden of proof upon the party challenging the agency's actions.

Appeal from the District Court for Lancaster County: John A. Colborn, Judge. Affirmed.

Cameron E. Guenzel, of Johnson, Flodman, Guenzel & Widger, for appellant.

Douglas J. Peterson, Attorney General, and James D. Smith for appellees.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Funke, J.

LaVeta Winslow, by and through her designated authorized representative The Evangelical Lutheran Good Samaritan Society - Superior (Evangelical), appeals the Lancaster County District Court's order affirming the denial of Winslow's September 2016 application for Medicaid benefits. Winslow claims Nebraska's Department of Health and Human Services (DHHS), Division of Medicaid and Long-Term Care, improperly determined she was ineligible for Medicaid due to excess resources, namely a house which was owned by a revocable trust. Winslow further claims DHHS failed to provide her a necessary form so the property could be excluded from her available resources pending sale. For the reasons set forth herein, we affirm.

## I. BACKGROUND

Winslow is a current resident of Evangelical, a skilled nursing facility located in Nuckolls County, Nebraska. Prior to moving to Evangelical, Winslow lived in a house in Mankato, Kansas, until she was hospitalized in September 2015. On October 1, 2015, she went from the hospital to Evangelical to receive additional living assistance. Although she was unable to return to the Mankato house beyond occasional visits, she maintained ownership of the home with the goal of her eventual return. While she resided at Evangelical, no one else lived in the house, she did not rent the house to anyone else, and she continued to store personal property there.

The record owner of the Mankato house was the LaVeta Winslow Living Trust dated April 27, 2004, and restated January 8, 2015. The trust identified Winslow as the "'Trustmaker'" and Winslow and her daughter Vycke Garman as trustees. As to the Mankato house and other property held by the trust, § 1.03 thereof required that the trustees administer and dispose of all trust property for Winslow's benefit and the benefit of her beneficiaries. Additionally, § 1.04 provided, in relevant part:

During my lifetime, I shall retain the powers set forth in this Section in addition to any powers that I reserve in other provisions of this agreement.

**(a) Action on Behalf of My Trust**

During any period that I am serving as a Trustee of my trust, I may act for and conduct business on behalf of my trust without the consent of any other Trustee.

**(b) Amendment, Restatement or Revocation**

I have the absolute right, at any time and from time to time, to amend, restate, or revoke any term or provision of this agreement in whole or in part. Any amendment, restatement, or revocation must be in a written instrument signed by me.

My agent acting under a valid power of attorney executed by me may amend this agreement to the extent the

agent is specifically authorized to do so in the instrument appointing the agent. An amendment made by my agent in good faith shall be conclusive on all persons interested in the trust and my agent shall not be liable for the consequences of any amendment or for not having amended the trust. An amendment by my agent must be in a written instrument signed by the agent.

### (c) Addition or Removal of Trust Property

I have the absolute right, at any time and from time to time, to add to the trust property and to remove any property from my trust.

Section 12.20 addressed Winslow and Garman's trustee powers as to real estate and stated in part, "My Trustee may sell at public or private sale, convey, purchase, exchange, lease for any period, mortgage, manage, alter, improve and in general deal in and with real property in such manner and on such terms and conditions as my Trustee deems appropriate."

Winslow also executed a durable special power of attorney appointing Garman and Cindy Kuhn to serve as Winslow's holders of financial power of attorney. This document provided Garman and Kuhn the "full power and authority to do everything necessary to transfer, assign, convey, and deliver any interest [Winslow] may have in property owned by [Winslow] to the then acting Trustee of the . . . LaVeta Winslow Living Trust."

In late 2015 and again in May 2016, Garman applied for Medicaid for Winslow. These applications were denied in part because Winslow's resources exceeded program standards. These resources included the Mankato house.

Garman again applied for Medicaid for Winslow on September 23, 2016. The September application indicated Winslow's assets included a car, a checking account, a savings account, an annuity account, an irrevocable burial trust, and the Mankato house.

On October 3, 2016, DHHS mailed Winslow a verification request seeking confirmation of Winslow's interest, dividends,

royalties, annuity, pension, and trust fund income and requesting Winslow's most recent bank statements and life insurance documentation. The request provided that "[f]ailure to provide verifications by 10-13-2016 could result in the denial, termination or decrease in [Winslow's] benefits."

On October 17, 2016, DHHS mailed Winslow another verification request seeking confirmation of "Current Trust, Bonds, Certificates of Deposit . . . , IRA, Money Market, Keogh, 401(K), [and] Mutual Funds." DHHS also requested a current accounting of the assets held by the trust. The request noted that Winslow was likely over the resource limit but that "if LaVeta is wanting to revoke the entire trust at this time and return all assets in the trust to herself she is able to do so. . . . Initially, if this is done she may still be over resources, but she could potentially gain Medicaid eligibility." The request again provided that "[f]ailure to provide verifications by 10-27-2016 could result in the denial, termination or decrease in [Winslow's] benefits."

In a DHHS supervisor narrative dated October 17, 2016, DHHS acknowledged that the trust assets were available to Winslow and that Winslow had the authority to revoke or amend the trust. This DHHS supervisor narrative copied an October 6 email from a program specialist with DHHS, Division of Medicaid and Long-Term Care, explaining Winslow's authority under the trust.

On November 4, 2016, DHHS mailed Winslow an initial notice of action denying her coverage for failure to provide information. The notice stated that the information requested in the October 17 request was applicable only if Winslow was dissolving her trust. If not, Winslow would remain over the resource limit and would be ineligible for Medicaid. The notice further provided that the September application would remain valid until December 22.

On December 20, 2016, Garman deeded the Mankato house from the trust to Winslow. On December 22, Winslow's attorney called DHHS concerning the Mankato house to request an

"IM-1 form"—a document entitled "Agreement to Sell Real Property and Repay Assistance" which allows an applicant 6 months to sell real property and excludes use of that property as a resource for Medicaid eligibility purposes. DHHS responded to Winslow's attorney that an IM-1 form would not be needed because DHHS had not determined whether Winslow's resources would be under the eligibility limits. Winslow then submitted verification documents on December 22, 23, and 28. DHHS eventually provided Winslow an IM-1 form sometime after December 22.

After reviewing the documentation provided in December 2016, DHHS determined Winslow was ineligible for Medicaid because her resources, which included two credit union accounts and the Mankato house, were above $4,000. On December 30, DHHS mailed Winslow notice of the denial which stated "Resources Exceed Program Standard" as the reason for Winslow's ineligibility. Also on December 30, Winslow signed the IM-1 form for the Mankato house. Winslow then reapplied for Medicaid, and on April 12, 2017, she was approved, with a share of cost, effective January 1, 2017.

Winslow filed an administrative appeal, and a hearing was held in June 2017. At the hearing, the parties agreed the main issue on appeal was whether the Mankato property "is a countable resource during the potential period of affected benefits for the September 2016 application." Testimony from Sarah Shurigar-Meyer and Garman was received.

Shurigar-Meyer was the lead Medicaid worker with DHHS, Division of Medicaid and Long-Term Care. In her testimony, she explained DHHS' reasoning for the denial of Winslow's September 2016 application. Specifically, Shurigar-Meyer testified that Winslow was denied because she was over the resource limit of $4,000 for Medicaid. Winslow's asset with the most value was the Mankato house, and Shurigar-Meyer testified Winslow would have been under the resource limit if the property were not an available resource. The Mankato house was determined to be an available resource "[b]ecause

the property was listed in a trust" and "there was not a[n] IM-1 [form] signed to exclude that property because it was listed in the trust." Shurigar-Meyer testified that once Winslow had the property transferred to her own name and signed the IM-1 form on December 30, 2016, Winslow was eligible for Medicaid benefits beginning in January 2017.

Shurigar-Meyer further explained that under DHHS policy, once DHHS becomes aware a property needs to be sold, DHHS is required to provide the applicant with an IM-1 form. Shurigar-Meyer testified:

> [T]here was a lot of information that was missing, that we were asking for, that wasn't provided until December 22nd, December 23rd[;] . . . even though we were aware of the property, there was still [a] question as to whether or not that property was accessible to [Winslow], and I don't know that we necessarily had that answer until we got the documentation that we needed on December 22nd and 23rd.

However, Shurigar-Meyer admitted on cross-examination that DHHS had the trust document prior to the September 2016 application and agreed that DHHS understood Winslow was authorized to revoke the trust and have the Mankato house returned to her name.

Garman testified to her participation in the application process. As to the Mankato house, she explained that she was aware that the house would need to be sold within 6 months after Winslow was approved for benefits. Pursuant to such understanding, Garman took actions in the fall of 2016 to clean out the house and discussed selling it to various people. Garman testified that while DHHS workers told Garman she would have to revoke the trust in order to sell the house, no one from DHHS advised her she could transfer the house to Winslow's name and utilize an IM-1 form to keep the house from being considered an available resource. Instead, Garman was first told about the IM-1 form by her attorney in December 2016. Garman explained that as

trustee, she always had authority to transfer the property back to Winslow.

Following the hearing, the interim director of DHHS, Division of Medicaid and Long-Term Care, issued an order affirming the denial of the September 2016 application. The order stated that Winslow "did not meet Medicaid eligibility requirements, due to resources, until the trust property was transferred to [Winslow], and an [IM-1 form] was signed."

Winslow appealed this decision to the district court, arguing that the Mankato house should have been excluded from her countable resources beginning August 1, 2016, and that DHHS should have furnished her with an IM-1 form in September 2016.

The district court affirmed the denial of benefits. In its opinion, the court found that the Mankato house did not qualify for Winslow's home because Winslow had not resided in the house for at least 6 months prior to the September 2016 application and the house was owned by the trust and not Winslow personally. As such, the house was not exempt from consideration as an available resource as Winslow's home under 477 Neb. Admin. Code, ch. 21, § 001.15B1 (2014), and Winslow was not entitled to additional time under 477 Neb. Admin. Code, ch. 21, § 001.15B5 (2014), to liquidate before it was counted as an available resource.

The court also determined that Winslow did not have the legal authority to liquidate the Mankato house until after Garman deeded it to her personally on December 20, 2016. Because Winslow did not have such authority, the court found that DHHS was not required to provide her an IM-1 form until after the transfer. Moreover, because Winslow did not sign an IM-1 form until December 30, the court held that January 1, 2017, was the appropriate start date since 477 Neb. Admin. Code, ch. 21, § 001.15B8 (2014), directs that the 6-month period in which the real property is excluded begins on the month following the signing of the IM-1 form. Winslow appeals this order.

## II. ASSIGNMENTS OF ERROR

Winslow assigns, restated, that the district court erred by (1) failing to find that the Mankato house was Winslow's home and exempt from consideration as an available resource, (2) failing to find that DHHS was required to provide Winslow an IM-1 form for the Mankato house while it was held by the revocable trust, and (3) finding that DHHS appropriately counted the Mankato house as an available resource and denied Winslow's September application.

## III. STANDARD OF REVIEW

[1] A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record.[1]

[2] When reviewing an order of a district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[2]

[3] Whether a decision conforms to law is by definition a question of law, in connection with which an appellate court reaches a conclusion independent of that reached by the lower court.[3]

## IV. ANALYSIS

[4,5] The Medicaid program provides joint federal and state funding of medical care for individuals whose resources are insufficient to meet the cost of necessary medical care.[4] A state is not obligated to participate in the Medicaid program;

---

[1] Neb. Rev. Stat. § 84-918 (Reissue 2014); *J.S. v. Grand Island Public Schools*, 297 Neb. 347, 899 N.W.2d 893 (2017).

[2] *J.S., supra* note 1.

[3] *Donna G. v. Nebraska Dept. of Health & Human Servs.*, 301 Neb. 838, 920 N.W.2d 668 (2018).

[4] *In re Estate of Vollmann*, 296 Neb. 659, 896 N.W.2d 576 (2017).

however, once a state has voluntarily elected to participate, it must comply with standards and requirements imposed by federal statutes and regulations.[5] Nebraska elected to participate in the Medicaid program through enactment of the Medical Assistance Act,[6] and DHHS is responsible for administering Nebraska's program.[7]

In order to be eligible for Medicaid, an individual applicant must be under a resource limit of $4,000.[8] This is determined by taking the total equity value of available, nonexcluded resources of the client and comparing it to the $4,000 maximum.[9] If the total equity value of available, nonexcluded resources exceeds the established maximum, the client is ineligible.[10] Available resources include cash or other liquid assets or any type of real or personal property or interest in property that the client owns and may convert into cash to be used for support and maintenance.[11]

## 1. Home Exemption

An applicant's home—defined as any shelter which the individual owns and uses as his or her principal place of residence—is exempt from being considered as an available resource.[12] However, if the applicant has moved away from the home and does not plan or is unable to return to it, it may be considered an available resource.[13] Specifically, when an applicant moves to a nursing home or to an assisted living facility and it is not possible to determine immediately

---

[5] *Id.*

[6] See Neb. Rev. Stat. § 68-901 et seq. (Reissue 2018).

[7] *In re Estate of Vollmann, supra* note 4.

[8] 477 Neb. Admin. Code, ch. 21, § 001.16 (2014).

[9] 477 Neb. Admin. Code, ch. 21, § 001.01 (2014).

[10] *Id.*

[11] 477 Neb. Admin. Code, ch. 21, § 001.03 (2014).

[12] § 001.15B1 and 477 Neb. Admin. Code, ch. 21, § 001.15B2 (2014).

[13] § 001.15B5.

if the client will be able to return to the property, a maximum of 6 months may be allowed to make that determination.[14] After these 6 months, the property may no longer be considered the individual's principal place of residence and must be considered an available resource.[15] However, the applicant is allowed time to liquidate the property before it affects eligibility.[16]

Here, it is uncontested that Winslow has been out of the Mankato house since September 2015. While an initial goal was for Winslow to return to the Mankato house, she stayed at Evangelical and returned to the house only for occasional visits. When Winslow submitted her September 2016 Medicaid application, she had been at Evangelical beyond the 6-month maximum and the Mankato house was no longer her principal place of residence under DHHS regulations.

Winslow claims the requirement that an applicant with property no longer considered a principal place of residence have time to liquidate the property before it affects eligibility means the property retains the home exemption during the liquidation proceedings even if this occurs outside of the 6-month period. As such, Winslow argues that attempting to liquidate property which was classified as a home allows the applicant to be eligible once the Medicaid application is submitted in contrast to attempting to liquidate real property other than a home where the eligibility period would begin the month after an IM-1 form is signed.

This distinction is unsupported by the regulations. The regulations clearly provide that if an applicant has lived in an assisted living facility and not on the subject property for a period beyond 6 months, the property is no longer considered the applicant's principal place of residence and is no longer a

---

[14] *Id.*

[15] *Id.*

[16] § 001.15B5 and 477 Neb. Admin. Code, ch. 21, §§ 001.15B5a and 001.15B7 (2014).

"home" for eligibility purposes.[17] As such, in order to exclude this property from the available resources calculation, the property is classified as real property other than a home, for which the applicant may sign an IM-1 form utilizing the procedure discussed below.[18]

In consideration of all of the above, the district court did not err in determining that the Mankato house was no longer Winslow's home for Medicaid eligibility purposes.

### 2. OTHER REAL PROPERTY EXCEPTION

If real property is not considered the applicant's home for eligibility purposes, the applicant may still be prospectively eligible pending the liquidation of the property.[19] Under § 001.15B7, entitled "Liquidation of Real Property," this period of exception is described as follows:

> When a client has excess resources because of real property, s/he may receive Medicaid pending liquidation of the resource, according to the following regulations. . . .
>
> Note: If the client has excess resources because of real property other than his or her home during a retroactive period, s/he is ineligible for Medicaid. The client may be prospectively eligible with excess resources because of real property if an [IM-1 form] is signed.

Under § 001.15B8 entitled "Time Limits for Liquidation," the procedure is described as follows:

> Real property which the client is making a good faith effort to sell must be excluded. First it must be determined if the individual has the legal authority to liquidate the property. If not, the client is allowed 60 days to initiate legal action to obtain authority to liquidate. . . .
>
> Once the client has the legal authority to liquidate the property, the client's signature on the [IM-1 form] must

---

[17] § 001.15B5.

[18] §§ 001.15B5, 001.15B5a, and 001.15B7.

[19] §§ 001.15B5a and 001.15B7.

be obtained. The client is allowed six calendar months to liquidate the real property. If the client refuses to sign the [IM-1 form], s/he is immediately ineligible because of excess resources. The six-month period begins with the month following the month in which the [IM-1 form] is signed.

Once the [IM-1 form] is signed, the six calendar months are counted, whether or not the client is receiving assistance.

[6] To summarize these regulations, if an applicant is determined to possess real property that is not subject to the home exemption and is considered an available resource, DHHS is required to make available an IM-1 form to the applicant provided that (1) the applicant has authority to liquidate the property and (2) the applicant would be under the available resource limit if the property is excluded from consideration.[20] Should DHHS determine the applicant does not have authority to liquidate the property, "the client is allowed 60 days to initiate legal action to obtain authority to liquidate."[21] Once an IM-1 form is signed, the applicant's 6-month eligibility period begins the following month.[22]

### (a) Authority to Liquidate

DHHS determined the Mankato property was an available resource and not Winslow's home for eligibility purposes. However, DHHS also determined that Winslow lacked authority to liquidate the property, because it was held by the trust rather than under her name. Shurigar-Meyer testified that for that reason, DHHS did not provide Winslow the IM-1 form until after the Mankato property was transferred from the trust to Winslow. Shurigar-Meyer explained that until that transfer occurred, there was still "[a] question as to whether or not

---

[20] §§ 001.15B7 and 001.15B8.

[21] § 001.15B8.

[22] *Id.*

that property was accessible to [Winslow]" because it was held by the trust.

[7] Under DHHS regulations, an applicant is not required to own the property in the applicant's own name for that property to be considered an available resource. Available resources are defined in § 001.03 as "cash or other liquid assets or any type of real or personal property or interest in property that the client owns and may convert into cash to be used for support and maintenance." We have previously found that available resources, therefore, can include assets held by trusts if a person establishes that trust with his or her assets and the individual is able to benefit from the corpus of the trust or the income derived therefrom.[23]

Similarly, the regulations which describe other real property eligible for the 6-month liquidation period do not require the real property to be listed under the applicant's own name.[24] These regulations require only real property which the applicant has the "legal authority to liquidate" and which is otherwise an available resource.[25] Thus, real property held by a revocable trust which is determined to be an available resource may be eligible for the 6-month exception if the applicant has authority to liquidate the property.

DHHS' contention that it could not determine whether Winslow had authority to liquidate the Mankato property until it was transferred back to Winslow's name is contradicted by the record. Shurigar-Meyer conceded that DHHS knew about the Mankato property and had the trust document prior to Winslow's September 2016 application. The trust identified Winslow as the trustmaker and listed Winslow as one of the trustees. One of the duties of the trustees was to administer

---

[23] See, *Pohlmann v. Nebraska Dept. of Health & Human Servs.*, 271 Neb. 272, 710 N.W.2d 639 (2006); *Boruch v. Nebraska Dept. of Health & Human Servs.*, 11 Neb. App. 713, 659 N.W.2d 848 (2003).

[24] See §§ 001.15B7 and 001.15B8.

[25] § 001.15B8.

and dispose of the property of the trust for Winslow's and her beneficiaries' benefit. As such, the trustees were empowered with authority to sell at public or private sale, convey, purchase, exchange, lease for any period, mortgage, manage, alter, or improve any real property held by the trust. Under the trust, Winslow retained the right to take action on behalf of the trust without the consent of any other trustee. Specifically, the trust provided that Winslow, during her lifetime, has "the absolute right, at any time and from time to time, to amend, restate, or revoke any term or provision of [the trust] in whole or in part" and "the absolute right, at any time and from time to time, to add to the trust property and to remove any property" from the trust. It is clear from the plain language of the trust that Winslow had the legal authority to liquidate the Mankato property through revocation of the trust reverting trust property back to her possession, transfer of the property to her name, or sale of the property under her authority as a trustee.

The record shows DHHS was aware by at least October 6, 2016, of Winslow's authority to revoke the trust. The October 6 email from the DHHS program specialist, which was copied onto a DHHS supervisor narrative, detailed DHHS' understanding that Winslow had the authority to revoke or amend the trust. Additionally, in the October 17 verification request, DHHS informed Winslow of this finding and stated, "[I]f LaVeta is wanting to revoke the entire trust at this time and return all assets in the trust to herself she is able to do so."

DHHS argues that there was confusion on whether the trust was revocable or irrevocable and that such a determination would have affected whether Winslow had authority to reach the trust assets and liquidate the Mankato property. In support of this argument, DHHS points to the length of the trust document and a filing by Winslow in March 2017 which alleged the "denial for assistance is erroneous" because DHHS "wrongly categorized property held in an irrevocable trust as an asset of . . . Winslow."

However, as noted above, the record shows DHHS determined the trust was revocable as early as October 2016. The length of the trust document did not prohibit DHHS from reaching this conclusion by that time. The document clearly established Winslow had authority as the trustmaker to revoke the trust and, as a trustee, to transfer property from the trust and sell or dispose of the property of the trust.

In summary, Winslow had authority to liquidate the Mankato property under the terms of the trust, DHHS had the trust document which provided such authority prior to September 2016, and DHHS acknowledged that it understood Winslow had the authority to revoke the trust and potentially become eligible by at least October 6. As such, DHHS and the district court erred in finding that Winslow lacked authority to liquidate the Mankato property while it was held by the trust.

### (b) Provision of IM-1 Form

As explained above, if an applicant (1) has authority to liquidate real property other than a home and (2) would be under the available resource limit if the property is excluded from consideration, DHHS is required to provide an IM-1 form.[26] Any period of prospective eligibility begins the month after the IM-1 form is provided and signed.[27]

DHHS provided Winslow the IM-1 form on or after December 22, 2016; she signed the form December 30; and she was prospectively eligible beginning in January 2017. DHHS argued it was not required to provide the IM-1 form prior to December 2016 because Winslow lacked the authority to liquidate since the property was held by the trust. As determined, this was in error and Winslow had such authority while the property was held by the trust. DHHS had the trust document and acknowledged Winslow could revoke the trust by, at least, October 6.

---

[26] §§ 001.15B7 and 001.15B8.

[27] § 001.15B8.

However, DHHS informed Winslow that no IM-1 form would be needed until it was determined that she would be under the available resource limit if the property were excluded from consideration. As a result, we must consider Winslow's available resources.

(c) Available Resource Limit

Winslow's asset with the most value was the Mankato house, and Shurigar-Meyer testified Winslow would have been under the resource limit if the property were not an available resource. As a result, once DHHS had sufficient information that Winslow's other available resources were below $4,000, it was required to provide Winslow an IM-1 form.

[8] We first note the rule that when challenging the decision of an administrative agency, the presumption under Nebraska law is that the agency's decision was correct, with the burden of proof upon the party challenging the agency's actions.[28] The record on appeal is limited as to when DHHS had information concerning the extent of Winslow's assets. While reference was made to various documents DHHS requested and received during the application process, the record does not include many of those documents or explanations as to what information those documents contained. Specifically, testimony and exhibits reference documents received December 22, 23, and 28, 2016, but these documents are not in our record and are not described beyond acknowledgment that DHHS received requested verification. It is unclear what relationship this documentation had to DHHS' determination that Winslow would be under the resource limit if the Mankato property were excluded.

In addition, DHHS' October 6, 2016, email indicates that a current accounting of all assets held by the trust was still needed and that an annuity verification signed by the financial

---

[28] *Gridiron Mgmt. Group v. Travelers Indemnity Co.*, 286 Neb. 901, 839 N.W.2d 324 (2013).

institution was required. Further, as late as December 28, DHHS was seeking additional information regarding assets held in another trust, the "Paul Wilson Trust formerly [the] Earl M[.] Winslow Trust." DHHS was still considering at that time what access Winslow had to this trust, if any.

As such, on the record before us, we find that the determination that Winslow would be under the available resource limit excluding the Mankato property did not occur prior to December 30, 2016.

## V. CONCLUSION

The district court correctly determined the Mankato property was not subject to the home exemption for Winslow's September 2016 Medicaid application. However, the court erred in determining the Mankato property was not eligible for the other real property exception because Winslow lacked authority to liquidate while it was held by the trust. Winslow had the authority to liquidate under the terms of the trust, and such authority was recognized by DHHS in October 2016. Nevertheless, on the record before us, Winslow failed to provide sufficient documentation prior to December 30 that she was under the available resource limit if she could exclude the Mankato property. As such, DHHS was not required to provide Winslow an IM-1 form until December 30. We therefore affirm the judgment of the district court.

Affirmed.