IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MURANTE V. MURANTE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JOHN MURANTE, APPELLEE,

V.

SAM MURANTE, SR., APPELLANT.

Filed March 24, 2020.    No. A-19-362.

Appeal from the District Court for Douglas County: TIMOTHY P. BURNS, Judge. Affirmed.

Matthew V. Rusch, of Erickson & Sederstrom, P.C., for appellant.

Michael L. Storey, Brian J. Brislen, and Patrick D. Wier, of Lamson, Dugan & Murray, L.L.P., for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

John Murante (John) sued his brother Sam Murante, Sr. (Sam), and Property Ventures, LLC (Property Ventures), for default on a promissory note and unjust enrichment. John sought recovery of a judgment in the amount due and owing on the note. After Property Ventures filed for bankruptcy, the matter proceeded solely against Sam. Thereafter, John and Sam filed cross-motions for summary judgment. The Douglas County District Court granted John's motion, overruled Sam's motion, and entered judgment in John's favor in the amount of the accrued balance of the note ($309,447.66) and any further accruing interest. Sam appeals the district court's entry of summary judgment in John's favor, and also claims the district court failed to dispose of John's unjust enrichment claim. We affirm.

- 1 -

## II. BACKGROUND

### 1. EVENTS SURROUNDING EXECUTION OF PROMISSORY NOTE

In 1999, John and his then-wife entered into a joint investment with Sam and his then-wife, Gloria Murante (Gloria), in property at 5622 Ames Street in Omaha, Nebraska, which the record reflects was a commercial property. Each couple was cumulatively a 50-percent owner of that property. By some point in 2011, both couples had divorced, and only John and Gloria each owned a 50-percent interest in the property. Around that time, a limited liability company for the property was formed, called 5622 Ames, LLC. We refer to both the property itself and the property as a limited liability company as "5622 Ames."

In 2002, Property Ventures was the successful bidder for the purchase and renovation of the South Omaha City Hall (SOCH) building located in Omaha. Sam, as a managing member of Property Ventures, needed $100,000 for the acquisition of SOCH. Sam and John agreed that John would provide $50,000 to Property Ventures in exchange for a 12.5-percent ownership in SOCH. Sam's son agreed to the same. Those agreements were set forth in a single 2002 "Conveyance Agreement" (Conveyance Agreement) signed by Sam as a grantor (on behalf of Property Ventures) and John and Sam's son as grantees (in their individual capacities). To finance his SOCH investment, John said he transferred about $50,000 from his capital account at 5622 Ames to himself (in an affidavit, John said he paid $50,213 toward the SOCH project); he said that he was personally entitled to those funds and that transaction was "treated on the books as a loan." John said he then transferred those funds to Property Ventures. Sam agreed that John took $50,000 from 5622 Ames and that at that moment John had possession and ownership of that money before using it for the SOCH project; 5622 Ames did not give that money directly to Property Ventures.

In 2007, Sam wrote a letter to John offering to memorialize John's ownership interest as a result of John's investment in SOCH per the Conveyance Agreement. The letter also reflected that Property Ventures owed John a "receivable" related to his SOCH investment. During his deposition for this case, Sam could not recall if the arrangement to memorialize John's ownership interest as proposed in the letter ever occurred. John asserted in an affidavit that he never received a memorialized ownership interest in SOCH. John said he received the 2007 letter along with an accounting document confirming his investment and setting forth the cash flow and tax credits that Sam and Property Ventures owed to him.

According to John, Sam presented him an affidavit with an attached promissory note in 2013. The promissory note itself showed it was executed by Sam in 2006, promising to pay John $101,768.12 in a lump-sum payment no later than June 2010. Interest would accrue at a rate of 5 percent per annum on the unpaid principal balance. Upon default, the interest rate would increase to the lesser of a rate of 16 percent per annum or the highest rate legally permissible. The note identified Sam as the "Borrower." Sam signed the note both individually and as the managing member of Property Ventures. The note was "the joint and several obligation of each Borrower." There are apparent revisions completed by Sam in handwritten form upon the original note in May 2010, including an agreement to extend the date to pay John back to the "ABSOLUTE DEADLINE" of December 31, 2013. Another revision indicated that the amount due regarded "3 LOAN TOTAL | FROM 56&AMES TO PVLLC in 2002." The handwritten revisions were signed

by Sam individually and as managing member of Property Ventures. The affidavit that accompanies the note was signed by Sam (individually) in August 2013. In the affidavit, Sam affirmed that he was the borrower in the note and the debt was owed to John under the note. The affidavit stated it was meant to encumber three properties to secure payment of the debt owed to John.

Sam later testified that he "crafted" the promissory note contemporaneously with the 2013 affidavit, adding the handwritten revisions on the note to make it look "better." He said he authored the affidavit to "support the attached note in an effort to encumber the property to make it more difficult for a potential judgment lienholder to acquire the property [described in the affidavit]." But Sam also said the note regarded "monies owed from the loan repayment from Property Ventures." According to John, sometime in 2005, 2006, or 2007, Sam verbally told John that Sam had executed the note to "protect" John's interest under the Conveyance Agreement that was "funded from a loan from 5622 Ames."

John believed the note guaranteed repayment for his SOCH investment. The Conveyance Agreement included a provision which allowed Sam to buy out John's (or Sam's son's) ownership interest based on the greater of: $125,000 or the actual value of John's (or Sam's son's) ownership interest based upon a current appraisal. The Conveyance Agreement also provided that John and Sam's son would receive tax credits. John thought the principal amount of the note ($101,768.12) was larger than his SOCH investment as stated in the Conveyance Agreement ($50,000) because the note was "essentially" a buyout of his ownership and also factored in the tax credits promised to him under the Conveyance Agreement. John estimated that factoring in interest, the buyout amount would have been "somewhere in that vicinity" of $101,768.12 in 2006 (when Sam executed the promissory note). However, John said he did not "author" or "create" the principal amount of the note.

From November 13 to 15, 2015, Sam initiated an email exchange with John about a dispute between John and Gloria concerning 5622 Ames, even though Sam no longer had an ownership interest in 5622 Ames at this point and was divorced from Gloria. In one email, Sam referenced "$50,213.75" as having been paid to John (apparently, from 5622 Ames) relating to the SOCH, which Sam noted he knew John "never got an interest in and [was] a loss due to circumstances beyond [Sam's] control"; in a later email, Sam said his mention of the "$50k [sic]" was only to inform John that he realized John "lost money"; Sam added, "I acknowledge you have a claim." On November 17, John and Gloria executed a confidential "Settlement Agreement and Limited Liability Company Membership Interest Purchase Agreement" (Settlement Agreement) under which John sold his rights, title, and interests in 5622 Ames to Gloria for a certain purchase price calculated based upon the adjusted book value of 5622 Ames. Gloria died in 2016.

## 2. PROCEDURAL BACKGROUND OF THIS ACTION

On January 18, 2017, John filed a complaint against Sam and Property Ventures. John alleged he had not received any payments due and owing on the promissory note. He asserted two theories of recovery: default on the promissory note and unjust enrichment. He alleged that the amount owed as of January 18 was $231,784.04 and that interest continued to accrue at 16 percent per annum. John sought a judgment of $231,784.04 plus further accrued interest, attorney fees,

and costs of the action. On February 20, Sam and Property Ventures filed a joint answer, denying the material allegations of the complaint. The answer included several affirmative defenses, including that John had "released" and "been satisfied as to any claim pursued in this action."

On January 22, 2019, Sam and John filed cross-motions for summary judgment. In John's motion, he asked for a judgment in his favor of $309,447.66 plus costs. The same day, Sam and John separately filed an index of evidence in support of their own motions and filed statements of allegedly undisputed facts. Thereafter, John filed a response to the facts that Sam claimed were undisputed and a "Motion for Contempt, Sanctions, and Attorney Fees and Expenses for Violation of Protective Order" against Sam regarding the confidentiality of the Settlement Agreement.

In February 2019, there was a hearing on the pending motions. John's counsel offered several exhibits, including Sam's 2018 deposition, the Conveyance Agreement, John's 2018 deposition, the 2007 letter from Sam to John, a SOCH accounting document for years 2003 to 2006 regarding "Purchase by [John], of 12.5% of SOCH Property," the 2015 email exchange between Sam and John, the promissory note and 2013 affidavit, the Settlement Agreement, and John's 2019 affidavit. Sam's counsel offered John's complaint, a 2019 affidavit of the trustee of the Gloria A. Murante Trust with the Settlement Agreement attached, and Sam's 2019 affidavit regarding this case. All offered exhibits were received into evidence; several exhibits were sealed pursuant to a protective order. In addition to receiving briefs, the district court heard arguments on the cross-motions for summary judgment. Those arguments revolved around whether the Settlement Agreement between John and Gloria released Sam's obligation of his indebtedness to John under the promissory note.

On March 13, 2019, the district court entered an order on the pending motions. It noted that Property Ventures was in bankruptcy and was not involved in the motions (Sam states on appeal that the company's involvement in this matter was terminated after it filed for bankruptcy in December 2017). The district court found that Sam had not paid any amount on his indebtedness under the promissory note. The district court was not persuaded that the Settlement Agreement between John and Gloria released Sam's obligation under the note. The district court sustained John's motion for summary judgment and overruled Sam's motion for summary judgment. Judgment was "entered in favor of [John] pursuant to the terms of the promissory note." John's motion for sanctions was denied given the judgment entered in his favor. On March 29, 2019, the district court entered an order that the judgment entered on March 13 was in the amount of $309,447.66 with interest continuing to accrue on that amount at 16 percent per annum on the unpaid balance from January 1 until the judgment was satisfied.

Sam appeals.

## III. ASSIGNMENTS OF ERROR

Sam claims the district court erred (1) by granting John's motion for summary judgment against Sam and (2) by failing to address John's unjust enrichment claim.

## IV. STANDARD OF REVIEW

Summary judgment is to be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Wintroub v. Nationstar Mortgage*, 303

Neb. 15, 927 N.W.2d 19 (2019). Under this standard of review, summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. See *id*. In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Wintroub v. Nationstar Mortgage, supra*.

## V. ANALYSIS

### 1. SUMMARY JUDGMENT

Sam contends the Settlement Agreement between John and Gloria contains "[r]elease language" which favors Sam, and should "at the very least" have precluded summary judgment in John's favor. Brief for appellant at 7.

### (a) General Principles Regarding Summary Judgment

A party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that it is entitled to judgment as a matter of law. *Wynne v. Menard, Inc*., 299 Neb. 710, 910 N.W.2d 96 (2018). If the movant meets this burden, then the nonmovant must show the existence of a material issue of fact that prevents judgment as a matter of law. *Id.*

When the parties' evidence would support reasonable, contrary inferences on the issue for which a movant seeks summary judgment, it is an inappropriate remedy. *Id.* Where reasonable minds could draw different conclusions from the facts presented, such presents a triable issue of material fact. See *id.* Conclusions based on guess, speculation, conjecture, or a choice of possibilities do not create material issues of fact for the purposes of summary judgment; the evidence must be sufficient to support an inference in the nonmovant's favor without the fact finder engaging in guesswork. *Kaiser v. Union Pacific RR. Co.*, 303 Neb. 193, 927 N.W.2d 808 (2019). At the summary judgment stage, the trial court determines whether the parties are disputing a material issue of fact. *Wynne v. Menard, Inc., supra*. It does not resolve the factual issues. *Id.*

### (b) Default on Promissory Note Claim

Our review of the evidence supports the district court's finding that Sam did not "contest the validity of the promissory note or its terms." On appeal, Sam does not dispute those matters or the amount of debt owed under the note. Therefore, there is no dispute that the promissory note is a valid contract between Sam and John. See *Five Points Bank v. White*, 231 Neb. 568, 437 N.W.2d 460 (1989) (note in usual commercial form is complete contract in itself). Although not specifically stated, the district court's order reflects that its decision was necessarily grounded in John's claim of default on the promissory note rather than his alternative theory of unjust enrichment. See *Washa v. Miller*, 249 Neb. 941, 546 N.W.2d 813 (1996) (doctrine of unjust enrichment is recognized only in absence of agreement between parties). John met his burden to show that no genuine issue of material fact existed regarding his claim that Sam was in default under the

promissory note. The burden shifted to Sam to show the existence of a material issue of fact which prevented judgment as a matter of law. See *Wynne v. Menard, Inc., supra.*

(c) Effect of Settlement Agreement Upon Promissory Note

One of Sam's affirmative defenses was that John's claim had been released against Sam. During his deposition, Sam answered repeatedly that the only reason he believed he did not have to pay John back under the promissory note was because he thought the Settlement Agreement (between John and Gloria) discharged that obligation. The only matter contested on the cross-motions for summary judgment before the district court and on appeal was whether the Settlement Agreement released John's present claim against Sam. We therefore turn to the relevant portions of the Settlement Agreement.

As stated in its preamble, the Settlement Agreement was executed:

> [B]y and between JOHN M. MURANTE, an individual ("<u>Seller</u>"), and GLORIA MURANTE, and individual ("<u>Buyer</u>"), with respect to the purchase and sale of all capital and profits membership interests in 5622 AMES . . . (the "<u>Company</u>"). The parties hereto are sometimes individually referred hereto as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

(Underscoring in original.) One of the purposes of the Settlement Agreement was that "the Parties [(John and Gloria)]" desired to "resolve any disputes or threatened litigation with respect to any and all claims involving or in any way relating to the Company [(5662 Ames)]."

The Settlement Agreement contains the following release provision, in relevant part:

> [T]he Parties and their respective successors, heirs and assigns hereby release and forever discharge each other, in all capacities, whether individually, as a fiduciary or in their corporate capacity, and their respective predecessors-in-interest, successors-in-interest, officers, Members, Managers, employees, representatives and agents, from any and all claims or cause of action of whatever kind or nature whether now known or unknown, foreseen or unforeseen, which in any way arise out of or relate to the Parties' ownership in or operation of the Company, and the Parties' ownership in [5622 Ames] prior to formation of the Company.

Further, another provision states that the Settlement Agreement, the exhibits referenced in it, and any documents delivered by the parties pursuant to it generally constitute the "entire agreement among the parties with respect to the subject matter [of the Settlement Agreement] and supersede all prior and contemporaneous agreements and understandings among the parties with respect to the subject matter of [the Settlement] Agreement." Although the Settlement Agreement refers to exhibits, no exhibits or other documents are attached to the identical versions of the Settlement Agreement that were received into evidence.

Sam argues that the Settlement Agreement release provision discharges him of his obligation under the promissory note. Again, the release applies to "all claims . . . which in any way arise out of or relate to the Parties' [(John and Gloria)] ownership in or operation of the Company [(5622 Ames)]." Sam maintains that the promissory note "arose out of [John's] ownership interest in 5622 Ames." Brief for appellant at 8. Sam points out his handwriting on the

promissory note ("3 LOAN TOTAL | FROM 56&AMES TO PVLLC in 2002") and the evidence that John's SOCH investment was funded out of John's capital account with 5622 Ames. But John asserts that the fact that he "happened to use his own money that was withdrawn from his ownership interest in 5622 Ames to fund to his investment in SOCH does not mean the SOCH [d]ebt arose out of or was related to John and Gloria's ownership in or operation of 5622 Ames." Brief for appellee at 10. John agrees with the district court that the Settlement Agreement had "'nothing to do'" with the promissory note. *Id.* at 9. The promissory note executed by Sam is not mentioned in the Settlement Agreement.

The district court properly found that Sam was not a party to the Settlement Agreement. There is no dispute that John and Gloria are the only individuals specifically identified as parties to the Settlement Agreement. During his deposition, Sam acknowledged that he was divorced from Gloria by the time the Settlement Agreement was executed; also, Sam conceded that he was not a party to the Settlement Agreement. But Sam believes he was released under the terms of the Settlement Agreement from John's present claim because he was Gloria's "predecessor in interest with regard to 5622 Ames." Brief for appellant at 13.

Essentially, Sam is attempting to benefit from the Settlement Agreement as a third-party beneficiary. As a matter of general contract law, the Nebraska Supreme Court has strictly construed who has the right to enforce a contract as a third-party beneficiary. See *Podraza v. New Century Physicians of Neb.*, 280 Neb. 678, 789 N.W.2d 260 (2010). In order for those not named as parties to recover under a contract as third-party beneficiaries, it must appear by express stipulation or by reasonable intendment that the rights and interest of such unnamed parties were contemplated and that provision was being made for them. *Podraza v. New Century Physicians of Neb., supra*. The right of a third party benefited by a contract to sue thereon must affirmatively appear from the language of the instrument when properly interpreted or construed. *Id.* A third-party beneficiary has the burden of showing that the provision was for his or her direct benefit. See *id.* Unless one can sustain this burden, a purported third-party beneficiary will be deemed merely incidentally benefited and will not be permitted to recover on or enforce the agreement. *Id.*

Particularly with regard to persons claiming to be third-party beneficiaries to release agreements, the "intent rule" governs. See *id.* at 689, 789 N.W.2d at 268. Under the intent rule, general releases which fail to specifically designate who is discharged either by name or by some other specific identifying terminology are inherently ambiguous, and the actual intent of the parties will govern. *Podraza v. New Century Physicians of Neb., supra*. As the intent rule was adopted in Nebraska, there is a rebuttable presumption that a release benefits only those specifically designated and it is the unnamed party claiming under the release who has the burden to show an actual intent to benefit him or her. See *id.*

Under the intent rule, actual intent governs as to everyone except those discharged by name or by some other specific identifying terminology. *Id.* However, this element of specific identification is only met when the reference in the release is so particular that a stranger can readily identify the released party and his or her identity is not in doubt. *Id.* The intent to release a person who did not participate in the agreement or pay consideration must be clearly manifest. *Id.*

As stated previously, Sam was not specifically named a party to the Settlement Agreement. The Settlement Agreement release provision was a mutual release between "the *Parties* [(John and

Gloria, as defined in the preamble)] and their respective successors, heirs and assigns . . . in all capacities, whether individually, as a fiduciary or in their corporate capacity, and their respective *predecessors-in-interest*, successors-in-interest, officers, Members, Managers, employees, representatives and agents." (Emphasis supplied.) Although the release specifically named John and Gloria, it did not specifically name Sam by use of his name or by way of including the general term "predecessors-in-interest." See *Podraza v. New Century Physicians of Neb.*, 280 Neb. at 690, 789 N.W.2d at 269 (definition of released parties under release agreement between plaintiffs and Alegent Health as including entities "affiliated with" Alegent Health did not satisfy level of specificity required for third-party beneficiary (different entity formed under separate parent company that contracted with Alegent Health) to rely solely on four corners of agreement). See, also, *Palmer v. Lakeside Wellness Ctr.*, 281 Neb. 780, 782, 798 N.W.2d 845, 848 (2011) (plaintiff sued fitness center and Precor, Inc.; Precor, Inc. was not explicitly mentioned in language of waiver signed by plaintiff with fitness center that generally released fitness center and its "affiliates" from all claims and Precor, Inc. failed to show that it was an intended third-party beneficiary of waiver).

Sam believes that the inclusion of the term "predecessors-in-interest" in the release clause was sufficient to specifically name him under the release. He argues that he was a "specific individual known to John at the time to be the 'predecessor in interest' to Gloria." Brief for appellant at 11. Sam contends that this case is distinguishable from *Podraza v. New Century Physicians of Neb., supra*, and *Palmer v. Lakeside Wellness Ctr., supra*, because "the party granting the release" (referring to John) "has had a relationship with the others involved--5622 Ames . . . Gloria . . . and Sam . . . for years." Reply brief for appellant at 4.

As the district court was aware, Sam used to have an ownership interest in 5622 Ames before all of his interest went to Gloria as part of their 2011 divorce. Although Sam was Gloria's predecessor-in-interest in part of her ownership percentage in 5622 Ames and John knew that, a stranger to the Settlement Agreement would not know that the term predecessor-in-interest referred to Sam. See *Podraza v. New Century Physicians of Neb., supra* (specific identification is only met when reference in release is so particular that *stranger* can readily identify released party and his or her identity is not in doubt). Stated another way, a stranger would not be able to "easily identify" to whom the term predecessor-in-interest refers as used in the Settlement Agreement without knowledge of the history of transfers of ownership interests in 5622 Ames. See *id.* at 690, 789 N.W.2d at 269. The Settlement Agreement in the form as it was received into evidence does not contain past ownership information.

Because Sam was not sufficiently identified in the release provision of the Settlement Agreement, there was a rebuttable presumption that the release benefitted only those specifically designated (John and Gloria). Therefore, Sam had the burden to prove that it was the actual intent of John and Gloria to benefit him under the release. However, as Sam thought he was sufficiently named in the release, he believed there was "no burden" upon him to "show any such intent." Brief for appellant at 11.

While emails show that Sam discussed the dispute underlying the Settlement Agreement with John prior to its execution and remarked that John had a "claim" regarding the SOCH investment, there is nothing in those emails or the other submitted evidence that shows an actual intent by John (or Gloria) to clear Sam of the obligation to pay John under the promissory note,

whether under the contemplated Settlement Agreement or otherwise. Also, Sam testified that he did not have a role in drafting or reviewing the Settlement Agreement before it was entered other than offering his opinion (to former wife Gloria, now-deceased) to settle the dispute. Sam admitted that the dispute regarding 5622 Ames in November 2015 (the led to the Settlement Agreement) was solely between John and Gloria and that he did not have a right or obligation to approve that settlement. There is neither evidence nor assertions that Sam participated in the execution of the Settlement Agreement in any meaningful way to the instant case or that Sam helped Gloria fulfill her owed consideration under the Settlement Agreement.

John aptly points out that the Settlement Agreement itself presents strong evidence that Sam was not intended to be benefitted under its release provision in light of a separate confidentiality provision that does mention Sam by name. The confidentiality provision provides that the Settlement Agreement was not to be disclosed to anyone except a list of individuals, including "Sam Murante." John states, the fact that "John and Gloria considered Sam during the negotiations and did not agree to release the SOCH [d]ebt [Sam] owed John only strengthens the presumption that they did not intend to benefit Sam with their mutual release." Brief for appellee at 15. We agree. See *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 279 Neb. 615, 780 N.W.2d 416 (2010) (expression of one thing implies exclusion of another).

Sam did not show that the release of the Settlement Agreement was actually intended to benefit him. Therefore, his defense that he was not obligated under the promissory note to John fails. See *Podraza v. New Century Physicians of Neb.*, 280 Neb. 678, 789 N.W.2d 260 (2010). For the same reason, Sam did not show that a material issue of fact prevented judgment in John's favor as a matter of law. See *Wynne v. Menard, Inc.*, 299 Neb. 710, 910 N.W.2d 96 (2018).

(d) Summary Judgment Disposition Was Warranted

Reviewing the evidence in a light most favorable to Sam and giving him the benefit of all reasonable inferences, the record discloses no genuine issue as to any material facts or any ultimate inferences that may be drawn from those facts regarding the Settlement Agreement. The Settlement Agreement has no application to Sam's obligation under the promissory note to John. In addition to our discussion of the legal principles from *Podraza* set forth above, it bears noting that the source of John's funds (his capital account in 5622 Ames) for his initial $50,000 investment in SOCH has absolutely no relevance to Sam's promise to pay John under the promissory note. According to John (and not disputed by Sam), the promissory note was related to Sam buying out John's interest in the SOCH property. To the extent John's withdrawal of cash from 5622 Ames remained a matter to be addressed on the company's books, this would have been an accounting matter between John and Gloria in reaching a final settlement amount when Gloria purchased John's interest in 5622 Ames. Regardless of where John obtained his capital, it was his purchase of a 12.5-percent interest in SOCH that prompted Sam to execute the promissory note. As noted by the district court, the Settlement Agreement "had nothing to do with the promissory note and dealt only with John and Gloria Murante's ownership interest in 5622 Ames." The district court properly granted summary judgment in John's favor.

## 2. Unjust Enrichment Claim

Sam claims that the district court's order is "unclear as to the scope of the summary judgment granted" in light of the alternate theory of recovery (unjust enrichment) pled in John's complaint. Brief for appellant at 14. However, Sam is aware that the district court entered judgment in John's favor "'pursuant to the terms of the promissory note,'" which was generally the relief requested under John's complaint for each pled theory of recovery (default on promissory note and unjust enrichment). *Id.* at 15.

The district court did not need to address the unjust enrichment theory because it was not the theory upon which the court relied for its decision. See, *Bloedorn Lumber Co. v. Nielson*, 300 Neb. 722, 915 N.W.2d 786 (2018) (express contract claim supersedes quasi-contract claim (i.e., unjust enrichment or quantum meruit claim) arising out of same transaction to extent that contract covers subject matter underlying requested relief); *Washa v. Miller*, 249 Neb. 941, 546 N.W.2d 813 (1996) (doctrine of unjust enrichment is recognized only in absence of agreement between parties); *Professional Recruiters v. Oliver*, 235 Neb. 508, 456 N.W.2d 103 (1990) (quantum meruit action may be joined in petition with express contract action, and judgment based on either will satisfy liability as to both claims where they have their origin in same transaction).

## VI. CONCLUSION

We affirm the district court's order granting summary judgment in John's favor.

AFFIRMED.